Barry I. Levy, Esq.
Michael Sirignano, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                Plaintiffs,

        -against-

ARUNA SUPPLY INC., A&D SUPPLY INC., AVISO
SUPPLY INC., DRS SUPPLY INC., ALENTUS SUPPLY
INC., AVAMED SUPPLY INC., FASTAMED SUPPLY
INC., DENNIS MAVASHEV, ROMAN BAKHRAMOV,
VYACHESLAV SOROKIN, and JOHN DOE
DEFENDANTS "1" through "10",

                Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (      )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or

"Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**INTRODUCTION**

1.    GEICO brings this action to recover more than $630,000.00 that Defendants have wrongfully obtained from GEICO and to terminate Defendants' on-going fraudulent scheme of exploiting the New York "No-Fault" insurance system by submitting millions of dollars in charges relating to medically unnecessary, illusory, and otherwise non-reimbursable pieces of durable medical equipment ("DME") and orthotic devices ("OD") (e.g. cervical collars, lumbar-sacral supports, orthopedic car seats, orthopedic pillows, massagers, electronic heat pads, egg crate mattresses, etc.) (collectively, the "Fraudulent Equipment"), allegedly provided to New York automobile accident victims who were insured by GEICO ("Insureds.") As discussed in this complaint, the Fraudulent Equipment was provided and billed by Defendants without regard for genuine patient care, but rather, for the Defendants' financial benefit and as a result of unlawful financial arrangements between the Defendants and others.

2.    Defendants Aruna Supply Inc. ("Aruna"), A&D Supply Inc. ("A&D"), Aviso Supply Inc. ("Aviso"), DRS Supply Inc. ("DRS"), Alentus Supply Inc. ("Alentus"), Avamed Supply Inc. ("Avamed"), and Fastamed Supply Inc. ("Fastamed")(collectively, "Supplier Defendants") are retailers that provide DME and are collectively owned by Dennis Mavashev ("Mavashev"), Roman Bakhramov ("Bakhramov"), and Vyacheslav Sorokin ("Sorokin") (the "Paper Owner Defendants")(collectively with the Supplier Defendants, the "Defendants").  The Paper Owner Defendants devised a scheme in conjunction with others who are not readily identifiable to GEICO to obtain prescriptions purportedly issued by various New York healthcare providers (the "Referring Providers") and to then use the Supplier Defendants consecutively and in conjunction with each other to submit large volumes of billing to GEICO and other New York

automobile insurance companies for purportedly providing Fraudulent Equipment, through the Supplier Defendants, that was medically unnecessary, illusory, and otherwise not reimbursable.

3.      Based upon the prescriptions for Fraudulent Equipment issued by the Referring Providers, the Supplier Defendants, the Paper Owner Defendants, and John Doe Defendants "1" – "10" (the "John Doe Defendants") (collectively, the "Defendants") allegedly provided Fraudulent Equipment to individuals who claimed to have been involved in automobile accidents in New York and eligible for coverage under no-fault insurance policies issued by GEICO ("Insureds").

4.      GEICO seeks to recover more than $630,000.00 that Defendants have wrongfully obtained from GEICO and, further, seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.2 million in pending No-Fault insurance claims that have been submitted on behalf of the Supplier Defendants because:

(i)     The Defendants billed GEICO for Fraudulent Equipment when they were ineligible to collect No-Fault Benefits because they failed to comply with local licensing requirements;

(ii)    The Defendants billed GEICO for Fraudulent Equipment purportedly provided to Insureds as a result of unlawful financial arrangements with others who are not presently identifiable;

(iii)   The Defendants billed GEICO for Fraudulent Equipment that was not medically necessary and was prescribed and dispensed – to the extent that any Fraudulent Equipment was provided – pursuant to prescriptions issued by the Referring Providers as a result of predetermined fraudulent protocols designed to exploit Insureds for financial gain, without regard for genuine patient care;

(iv)    The Defendants billed GEICO Fraudulent Equipment that was provided – to the extent that any equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by the Referring Providers who are licensed to issue such prescriptions;

(v)     To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently mispresented the type and nature of the Fraudulent Equipment purportedly provided to Insureds as the Healthcare Common Procedure

Coding System ("HCPCS") Codes identified in the bills did not accurately represent what was provided to Insureds;

(vi)     To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment submitted to GEICO by the Defendants fraudulently misrepresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

5.      The Defendants fall into the following categories:

(i)      The Supplier Defendants are New York corporations that purport to purchase DME from wholesalers, purport to provide Fraudulent Equipment to automobile accident victims, and bill New York automobile insurers, including GEICO, for providing Fraudulent Equipment.

(ii)     The Paper Owner Defendants are listed on paper as the owners, operators, and controllers of the Supplier Defendants when, as discussed below, they work for one of the John Doe Defendants who secretly controls and profits from each of the Supplier Defendants and used the Paper Owner Defendants to submit bills to GEICO and other New York automobile insurers for Fraudulent Equipment purportedly provided to automobile accident victims.

(iii)    The John Doe Defendants are citizens of New York and are presently not identifiable but: (i) secretly control and profit from the Supplier Providers; (ii) associate with the Referring Providers and various multi-disciplinary medical offices that purportedly treat high-volume of No-Fault insurance patients (the "Clinics") and are the sources of prescriptions to the Supplier Defendants; and/or (iii) conspire with the Paper Owner Defendants to further the fraudulent schemes against GEICO and other automobile insurer.

6.      As discussed below, the Defendants have always known that the claims for the

Fraudulent Equipment submitted to GEICO were fraudulent and not reimbursable because:

(i)      The bills for Fraudulent Equipment submitted by the Defendants to GEICO fraudulently misrepresented that the Defendants complied with all local licensing requirements when the Defendants were not lawfully licensed to provide the Fraudulent Equipment by the New York City Department of Consumer and Worker Protection (formerly Department of Consumer Affairs), as they misrepresented the ownership for each of the Supplier Defendants;

(ii)     The Fraudulent Equipment was provided – to the extent that any equipment was provided – based upon prescriptions received as a result of unlawful

financial arrangements between the Defendants and others who are not presently identifiable and, thus, not eligible for no-fault insurance reimbursement in the first instance;

(iii) The prescriptions for Fraudulent Equipment were not medically necessary and the Fraudulent Equipment was provided – to the extent that any equipment was provided – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others not presently known rather than to treat or otherwise benefit the Insureds;

(iv) The Fraudulent Equipment was provided – to the extent that any equipment was provided – as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions; and

(v) To the extent that any Fraudulent Equipment was provided to Insureds, the bills for Fraudulent Equipment submitted by the Defendants to GEICO – and other New York automobile insurers – fraudulently misrepresented the type and nature of the Fraudulent Equipment purportedly provided to the Insureds as the HCPCS Codes identified in the bills did not accurately represent what was actually provided to Insureds

(vi) To the extent that any equipment was provided to Insureds, the bills for Fraudulent Equipment the Defendants submitted to GEICO – and other New York automobile insurers – fraudulently mispresented that the charges were permissible and grossly inflated the permissible reimbursement rate that the Defendants could have received for the Fraudulent Equipment.

7.     As such, the Defendants do not how have – and never had – any right to be compensated for the Fraudulent Equipment billed to GEICO through the Supplier Defendants.

8.     The charts attached hereto as Exhibits "1" through "7" sets forth a representative sample of the fraudulent claims that have been identified to date that were submitted, or caused to be submitted, to GEICO pursuant to the Defendants' fraudulent scheme through the Supplier Defendants.

9.     The Defendants fraudulent scheme against GEICO and the New York automobile insurance industry began no later than September 2020, and the scheme has continued uninterrupted since that time.

10.     As a result of the Defendants' fraudulent schemes, GEICO has incurred damages of more than $630,000.00.

## THE PARTIES

### I.     Plaintiffs

11.     Plaintiffs, Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue policies of automobile insurance in the State of New York.

### II.    Defendants

12.     Defendant Aruna is a New York corporation with its principal place of business in Rego Park, New York.  Aruna was incorporated on October 26, 2022, and is owned on paper and purportedly operated and controlled by Mavashev. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Aruna and, with the aid of Mavashev, uses Aruna as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

13.     Defendant A&D is a New York corporation with its principal place of business in Brooklyn, New York.  A&D was incorporated on March 2, 2022, and is owned on paper and purportedly operated and controlled by Mavashev and Bakhramov. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from A&D and, with the aid of Mavashev and Bakhramov, uses A&D as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

14.     Defendant Aviso is a New York corporation with its principal place of business in Brooklyn, New York.  Aviso was incorporated on March 2, 2022, and is owned on paper and purportedly operated and controlled by the Paper Owner Defendants, collectively.  However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Aviso and, with the aid of the Paper Owner Defendants, uses Aviso as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

15.     Defendant DRS is a New York corporation with its principal place of business in Fresh Meadows, New York.  DRS was incorporated on January 2, 2020, and is owned on paper and purportedly operated and controlled by Mavashev and Bakhramov. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from DRS and, with the aid of Mavashev and Bakhramov, uses DRS as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

16.     Defendant Avamed is a New York corporation with its principal place of business in Brooklyn, New York.  Avamed was incorporated on February 24, 2023, and is owned on paper and purportedly operated and controlled by Sorokin. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Avamed and, with the aid of Sorokin, uses Avamed as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

17.     Defendant Alentus is a New York corporation with its principal place of business in Queens, New York.  Alentus was incorporated on December 28, 2022, and is owned on paper and purportedly operated and controlled by Sorokin. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Alentus

and, with the aid of Sorokin, uses Alentus as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

18.     Defendant Fastamed is a New York corporation with its principal place of business in Hewlett, New York.  Fastamed was incorporated on April 24, 2023, and is owned on paper and purportedly operated and controlled by Mavashev. However, John Doe Defendant 1 was at all relevant times the true owner and the individual who secretly controls and profits from Fastamed and, with the aid of Mavashev, uses Fastamed as a vehicle to submit fraudulent billing to GEICO and other New York automobile insurers.

19.     Defendant Mavashev resides in and is a citizen of New York. Mavashev is not and has never been a licensed healthcare provider.

20.     Defendant Bakhramov resides in and is a citizen of New York. Bakhramov is not and has never been a licensed healthcare provider.

21.     Defendant Sorokin resides in and is a citizen of New York. Sorokin is not and has never been a licensed healthcare provider.

## JURISDICTION AND VENUE

22.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states.

23.     Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ["RICO"] Act) because they arise under the laws of the United States.

24.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

25.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the district where a substantial amount of the activities forming the basis of the Complaint occurred, and where one or more of the Defendants reside.

## ALLEGATIONS COMMON TO ALL CLAIMS

26.     GEICO underwrites automobile insurance in the State of New York.

**I.      An Overview of the Pertinent Laws**

**A.      Pertinent Laws Governing No-Fault Insurance Reimbursement**

27.     New York's "No-Fault" laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need.

28.     Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

29.     In New York, No-Fault Benefits include up to $50,000.00 per Insured for medically necessary expenses that are incurred for healthcare goods and services, including goods for DME and OD. See N.Y. Ins. Law § 5102(a).

30.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "New York Fee Schedule").

31.     Pursuant to the No-Fault Laws, healthcare service providers are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

32.     For instance, the implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet <u>any</u> applicable New York State or local licensing requirement necessary to perform such service in New York or meet <u>any</u> applicable licensing requirement necessary to perform such service in any other state in which such service is performed.

(Emphasis added).

33.     In <u>State Farm Mut. Auto. Ins. Co. v. Mallela</u>, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare services providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

34.     Title 20 of the City of New York Administrative Code imposes licensing requirements on healthcare providers located within the City of New York which engage in a business which substantially involves the selling, renting, repairing, or adjusting of products for the disabled, which includes DME and OD.

35.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products for the Disabled License ("Dealer in Products License") issued by the New York City Department of Consume and Worker Protection, formerly Department of Consumer Affairs ("DCWP") in order to lawfully provide DME or OD to the disable, which is defined as "a person who has a physical or mental impairment resulting from anatomical or physiological conditions which prevents the exercise of a normal bodily function or is demonstrable by medically accepted clinical or laboratory diagnostic techniques". <u>See</u> 6 RCNY § 2-271; NYC Admin. Code §20-426.

36.     It is unlawful for any DME/OD supplier to engage in the selling, renting, fitting, or adjusting of products for the disabled within the City of New York without a Dealer in Products License.  See NYC Admin. Code §20-426.

37.     A Dealer in Products License is obtained by filing a license application with the DCWP. The application requires that the applicant identify, among other pertinent information, the commercial address of where the DME/OD supplier is physically operating from.

38.     The license application for a Dealer in Products License also requires the applicant to affirm that they are authorized to complete and submit the application on behalf of the corporate entity seeking a license and that the information contained in the application is true, correct, and complete. The affirmation to the application requires a signature that is made under penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

39.      New York law also prohibits licensed healthcare services providers, including chiropractors and physicians, from paying or accepting kickbacks in exchange for referrals for DME or OD. See, e.g., N.Y. Educ. Law §§ 6509-a, 6530(18), 6531; 8 N.Y.C.R.R. § 29.1(b)(3).

40.     Prohibited kickbacks include more than simple payment of a specific monetary amount, it includes "exercising undue influence on the patient, including the promotion of the sale of services, goods, appliances, or drugs in such manner as to exploit the patient for the financial gain of the licensee or of a third party". See N.Y. Educ. Law §§ 6509-a, 6530(17); 8 N.Y.C.R.R. § 29.1(b)(2).

41.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for medically necessary goods and services, using the claim form required by the New York State Department of Insurance (known as

"Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").

42.     In the alternative, a healthcare service provider may submit claims using the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500" or "CMS-1500 form").

43.     Pursuant to Section 403 of the New York State Insurance Law, the NF-3 Forms submitted by healthcare service providers to GEICO, and to all other insurers, must be verified subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for commercial insurance or a statement of claim for any commercial or personal insurance benefits containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto . . ., commits a fraudulent insurance act, which is a crime.

44.     Similarly, all HCFA-1500 (CMS-1500) forms submitted by a healthcare service provider to GEICO, and to all other automobile insurers, must be verified by the healthcare service provider subject to the following warning:

> Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

**B.     Pertinent Regulations Governing No-Fault Benefits for DME and OD**

45.     Under the No-Fault Laws, No-Fault Benefits can be used to reimburse medically necessary DME or OD that was provided pursuant to a lawful prescription from a licensed healthcare provider. See N.Y. Ins. Law § 5102(a). By extension, DME or OD that was provided without a prescription, pursuant to an unlawful prescription, or pursuant to a prescription from a layperson or individual not lawfully licensed to provide prescriptions, is not reimbursable under No-Fault.

46.     DME generally consists of items that can withstand repeated use, and primarily consists of items used for medical purposes by individuals in their homes. For example, DME can include items such as bed boards, cervical pillows, orthopedic mattresses, electronic muscle stimulator units ("EMS units"), infrared heat lamps, lumbar cushions, orthopedic car seats, transcutaneous electrical nerve stimulators ("TENS units"), electrical moist heating pads (known as thermophores), cervical traction units, whirlpool baths, cryotherapy, continuous passive motion devices, cervical traction units, and devices to prevent deep vein thrombosis.

47.     OD consists of instruments that are applied to the human body to align, support, or correct deformities, or to improve the movement of joints, spine, or limbs. These devices come in direct contact with the outside of the body, and include such items as cervical collars, lumbar supports, knee supports, ankle supports, wrist braces, and the like.

48.     To ensure that Insureds' $50,000.00 in maximum No-Fault Benefits are not artificially depleted by inflated DME or OD charges, the maximum charges that may be submitted by healthcare providers for DME and OD are set forth in the New York Fee Schedule.

49.     In a June 16, 2004 Opinion Letter entitled "No-Fault Fees for Durable Medical Equipment", the New York State Insurance Department recognized the harm inflicted on Insureds by inflated DME and OD charges:

> [A]n injured person, with a finite amount of No-Fault benefits available, having assigned his rights to a provider in good faith, would have DME items of inflated fees constituting a disproportionate share of benefits, be deducted from the amount of the person's No-Fault benefits, resulting in less benefits available for other necessary health related services that are based upon reasonable fees.

50.     As it relates to DME and OD, the New York Fee Schedule sets forth the maximum charges as follows:

(a)     The maximum permissible charge for the purchase of durable medical equipment… and orthotic [devices] . . . shall be the fee payable for such equipment or supplies

13

under the New York State Medicaid program at the time such equipment and supplies are provided . . . if the New York State Medicaid program has not established a fee payable for the specific item, then the fee payable, shall be the lesser of:

(1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts, or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or

(2) the usual and customary price charged to the general public.

See 12 N.Y.C.R.R. § 442.2 (2021).

51.     As indicated by the New York Fee Schedule, up to April 4, 2022, payment for DME or OD is directly related to the fee schedule set forth by the New York State Medicaid program ("Medicaid").

52.     According to the New York Fee Schedule, in instances where Medicaid has established a fee payable ("Fee Schedule item"), the maximum permissible charge for DME or OD is the fee payable for the item set forth in Medicaid's fee schedule ("Medicaid Fee Schedule").

53.     For Fee-Schedule items, Palmetto GBA, LLC ("Palmetto"), a contractor for the Center for Medicare & Medicaid Services ("CMS"), was tasked with analyzing and assigning and assigning HCPCS Codes that should be used by DME and OD companies to seek reimbursement for – among other things – Fee Schedule items. The HCPCS Codes and their definitions provide specific characteristics and requirements that an item of DME or OD must meet in order to qualify for reimbursement under a specific HCPCS Code.

54.     The Medicaid Fee Schedule is based upon fees established by Medicaid for HCPCS Codes promulgated by Palmetto. Medicaid has specifically defined the HCPCS Codes contained within the Medicaid Fee Schedule in its Durable Medical Equipment, Orthotics, Prosthetics and Supplies Procedure Codes and Coverage Guidelines ("Medicaid DME Procedure Codes") which mimic the definitions set forth by Palmetto.

55.     Where a specific DME or OD does not have a fee payable in the Medicaid Fee Schedule ("Non-Fee Schedule item") then the fee payable by an insurer such as GEICO to the provider shall be the lesser of: (i) 150% of the acquisition cost to the provider; or (ii) the usual and customary price charged to the general public.

56.     For Non-Fee Schedule items, the New York State Insurance Department recognized that a provider's acquisition cost must be limited to costs incurred by a provider in a "bona fide arms-length transaction" because "[t]o hold otherwise would turn the No-Fault reparations system on its head if the provision for DME permitted reimbursement for 150% of any documented cost that was the result of an improper or collusive arrangement." See New York State Insurance Department, No-Fault Fees for Durable Medical Equipment, June 16, 2004 Opinion Letter.

57.     To the extent that bills for No-Fault Benefits are for Non-Fee Schedule items that are identified by HCPCS Codes, the definitions for set forth by Palmetto control to determine whether an item of DME or OD qualify for reimbursement under a specific HCPCS Code.

58.     Additionally, many HCPCS Codes relate to OD that has either been prefabricated, custom-fitted and/or customized. Palmetto published a guide to differentiate between custom-fitted items and off-the-shelf, prefabricated items, entitled, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised. As part of its coding guide, Palmetto has identified who is qualified to properly provide custom-fitted OD.

59.     The maximum reimbursement rates for providing DME or OD to automobile accident victims under the No-Fault Laws set forth above includes all shipping, handling, and delivery. See 12 N.Y.C.R.R. § 442.2(c). As such, DME/OD suppliers are not entitled to submit separate charges for shipping, handling, delivery, or set up of any DME or OD.

60.     In an effort to reduce the blatant fraud committed against insurers for abusive charges relating to DME, the New York State Workers' Compensation Board replaced the New York State Medicaid Program's Durable Medical Equipment Fee Schedule with a new New York State Workers' Compensation Durable Medical Equipment Fee Schedule ("WC DME Fee Schedule") that became effective on April 4, 2022.

61.     Among other things, the WC DME Fee Schedule limited the reimbursement rates of certain previously abused DME charges, such as charges for the rental of certain continuous passive motion devices. The changes made for the reimbursement for DME by the New York State Workers' Compensation Board are reflected in 12 N.Y.C.R.R. 442.2 (2022).

62.     Similarly, effective June 1, 2023, the New York State Department of Financial Services issued an amendment to 11 N.Y.C.R.R. 68, adding Part E of Appendix 17-C, to address No-Fault reimbursement for DME that is not specifically identified by the WC DME Fee Schedule.

63.     However, between the time period of April 4, 2022, and May 31, 2023, to address the vagueness of determining the reimbursement of No-Fault for certain changes not identified in the WC DME Fee Schedule, the New York State Department of Financial Services issued an emergency amendment explaining the standard for reimbursement when there is no price contained in the WC DME Fee Schedule.

64.     For all charges after April 4, 2022, related to Non-Fee Schedule items that are provided by a DME/OD Supplier, the maximum permissible reimbursement rate is the lesser of: (1) the acquisition cost (i.e. the line item cost from a manufacturer or wholesaler net of any rebates, discounts or other valuable considerations, mailing, shipping, handling, insurance costs or any sales tax) to the provider plus 50%; or (2) the usual and customary price charged to the general public. See 11 N.Y.C.R.R. 68, Appendix 17-C, Part E.

65.     Accordingly, when a healthcare provider submits a bill to collect charges from an insurer for DME or OD using either a NF-3 or HCFA-1500 form, the provider represents – among other things – that:

(i)     The provider is in compliance with all significant statutory and regulatory requirements;

(ii)    The provider received a legitimate prescription for reasonable and medically necessary DME from a healthcare practitioner that is licensed to issue such prescriptions;

(iii)   The prescription for DME or OD is not based any unlawful financial arrangement;

(iv)    The DME or OD identified in the bill was actually provided to the patient based upon a legitimate prescription identifying medically necessary item(s);

(v)     The HCPCS Code identified in the bill actually represents the DME or OD that was provided to the patient; and

(vi)    The fee sought for DME or OD provided to an Insured was not in excess of the price contained in the applicable DME Fee Schedule (Medicaid Fee Schedule or WC DME Fee Schedule) or the standard used for a Non-Fee Schedule item.

## II.     The Defendants' Fraudulent Schemes

### A.     The Supplier Defendants' Common Secret Ownership and An Overview of the Fraudulent Scheme

66.     Beginning in or about June 2021, the John Doe Defendants associated with the Paper Owner Defendants to implement a complex fraudulent scheme in which the Supplier Defendants were used concurrently and in conjunction with each other to bill GEICO and other New York automobile insurers for millions of dollars in No-Fault Benefits to which they were never entitled to receive.

67.     This scheme was put into place on the heels of Sorokin being sued by another New York automobile insurer as a result of his alleged involvement in a no-fault insurance fraud scheme

where he and a DME company he owned would receive and use generic or vague prescriptions to bill the insurer for expensive DME despite only providing inexpensive DME, to the extent they provided any DME at all. See e.g. Allstate et. al. v. Abayev, Docket No.: 1:20-cv-03302-WFK-TAM (E.D.N.Y.).

68.     While each of the Supplier Defendants were opened and listed as being owned by one of the Paper Owner Defendants, all the Supplier Defendants were actually owned and controlled by John Doe Defendant 1, who is not presently identifiable to GEICO (hereinafter, the "Secret Owner"), who also profited from the fraudulent scheme committed against GEICO and other New York automobile-insurers.

69.     The Secret Owner was able to secretly control and profit from the Supplier Defendants by using each of the Paper Owner Defendants as straw owners who would place their names on documents that needed to be filed with the State of New York and City of New York to lawfully operate the Supplier Defendants.

70.     For example, the Secret Owner listed different Paper Owner Defendants on incorporation paperwork and Dealer in Products license applications for each of the Supplier Defendants. Filing that paperwork permitted the Defendants to bill GEICO as purportedly legitimate DME/OD suppliers when, in fact, the Supplier Defendants existed solely as a means to submit fraudulent billing to GEICO and other New York automobile insurers.

71.     The fraudulent scheme specifically required the Paper Owner Defendants to be listed on the incorporation documents and on the Dealer in Products license applications to hide the Secret Owner's involvement in the Supplier Defendants.

72.     The Secret Owner took these steps to conceal the true ownership of each of the Supplier Defendants to give the illusion that each of the Supplier Defendants was a separate and distinct entity and conceal their involvement in a common fraudulent scheme.

73.     The fact that the Secret Owner actually owned the Supplier Defendants is illustrated by the inconsistencies/contradictions in the Supplier Defendants' paperwork with New York State, the DCWP, and information billed to GEICO. For example:

      a.    As it relates to Aviso, Sorokin completed and signed Aviso's Dealer in Products license application, which was paid by Mavashev, and Bakhramov – not Sorokin or Mavashev – is listed as the owner on the NF-3 billing forms submitted to GEICO.

      b.    As it relates to DRS, Bakhramov completed and signed DRS's Dealer in Products license application but included Sorokin's phone number for DRS and was incorporated by Mavashev.

      c.    In the Dealer in Products license application for Alentus, Sorokin listed DRS as another entity he owns that previously applied for a Dealer in Products license.

74.     Further evidence of the Supplier Defendants' collective ownership is the fact that each uses the same "Authorization of Direct Payments and Lien" form, including the fact that Avamed, A&D, Aruna, and Aviso have used the same form that incorrectly references DRS. Such overlap in the forms – and forms with errors – would not be expected of "separate and distinct" entities owned by different individuals.

75.     For example:

## DRS Supply INC

209 Avenue U
Brooklyn, NY 11232
DRSSUPPLYINC@GMAIL.COM

### AUTHORIZATION OF DIRECT PAYMENTS AND LIEN

RE: Patient Records and lien

I do hereby authorize DRS SUPPLY Inc to furnish you, my attorney, with a full report of diagnostic test or any treatments performed on me in regard to the accident in which I was involved on    01.05.22
authorize and direct you, my attorney, to pay directly to DRS SUPPLY Inc. such sums as may be necessary to adequately compensate DRS Supply Inc. for medical services rendered to me by reason of this accident and by reason of any other bills that are due this office and to withhold such sums from any settlement, judgment or verdict as may be necessary to protect the interest of DRS Supply Inc.

Please be advised that pursuant to a recent decision in 2006 NY Slip Op 9604 (App. Div., 2nd Dept.), an insurer is allowed to deny a claim retroactively to the date of loss for claimant's failure to attend Independent Medical Examinations swhen, and as often as, the (Insurer) may reasonably requires (11 NYCRR 65-1.1) the attendance at the IME. The decision means that should your patient fail, without any justification, to appear at the IME or at the examination under oath all benefits will be denied entirely from the date of the accident. Furthermore, the assignment of benefits form that you signed will be null and void and you will be responsible to DRS Supply Inc for all bills.

Prior to my being seen by DRS Supply Inc., I executed an assignment of benefits form, whereby I directed the insurance company responsible of the payment of my medical expenses to pay DRS Supply Inc. directly, for services rendered. I understand that I am personally and fully responsible  DRS Supply Inc. for the services rendered to me  This agreement is made solely for additional protection, and in consideration of DRS Supply Inc., awaiting payments.

2/16/22
_____
Date

_____
Patient Name

_____
Patient's Signature

*The undersigned, being the attorney of record for the above patient does hereby acknowledge receipt of the above lien.*

_____
Date

_____
Attorney's Signature

Attorney:*Please date, sign and return one copy to our office
*Keep one copy for your records

---

## A & D SUPPLY INC

1202 Avenue U,Brooklyn,NY
11229,# 1165
aandd2002@yahoo.com

### AUTHORIZATION OF DIRECT PAYMENTS AND LIEN

RE: Patient Records and lien

I do hereby authorize A & D SUPPLY INC to furnish you, my attorney, with a full report of diagnostic test or any treatments performed on me in regard to the accident in which I was involved on    5.1.2022
authorize and direct you, my attorney, to pay directly to A & D SUPPLY INC. such sums as may be necessary to adequately compensate A & D SUPPLY INC. for medical services rendered to me by reason of this accident and by reason of any other bills that are due this office and to withhold such sums from any settlement, judgment or verdict as may be necessary to protect the interest of A & D SUPPLY INC.

Please be advised that pursuant to a recent decision in 2006 NY Slip Op 9604 (App. Div., 2nd Dept.), an insurer is allowed to deny a claim retroactively to the date of loss for claimant's failure to attend Independent Medical Examinations swhen, and as often as, the (Insurer) may reasonably requires (11 NYCRR 65-1.1) the attendance at the IME. The decision means that should your patient fail, without any justification, to appear at the IME or at the examination under oath all benefits will be denied entirely from the date of the accident. Furthermore, the assignment of benefits form that you signed will be null and void and you will be responsible to DRS Supply Inc for all bills.

Prior to my being seen by A & D SUPPLY INC., I executed an assignment of benefits form, whereby I directed the insurance company responsible of the payment of my medical expenses to pay A & D SUPPLY INC. directly, for services rendered. I understand that I am personally and fully responsible  A & D SUPPLY INC. for the services rendered to me  This agreement is made solely for additional protection, and in consideration of AVISO Supply Inc., awaiting payments.

6/1/22
_____
Date

_____
Patient Name

_____
Patient's Signature

*The undersigned, being the attorney of record for the above patient does hereby acknowledge receipt of the above lien.*

_____
Date

_____
Attorney's Signature

Attorney:*Please date, sign and return one copy to our office
*Keep one copy for your records

---

## ARUNA SUPPLY INC

6362 SAUNDERS ST.,202C,
REGO PARK,NEW YORK,11374
arunasupply@yahoo.com

### AUTHORIZATION OF DIRECT PAYMENTS AND LIEN

RE: Patient Records and lien

I do hereby authorize ARUNA SUPPLY INC to furnish you, my attorney, with a full report of diagnostic test or any treatments performed on me in regard to the accident in which I was involved on    10.31.2022
authorize and direct you, my attorney, to pay directly to ARUNA SUPPLY INC. such sums as may be necessary to adequately compensate ARUNA SUPPLY INC. for medical services rendered to me by reason of this accident and by reason of any other bills that are due this office and to withhold such sums from any settlement, judgment or verdict as may be necessary to protect the interest of ARUNA SUPPLY INC.

Please be advised that pursuant to a recent decision in 2006 NY Slip Op 9604 (App. Div., 2nd Dept.), an insurer is allowed to deny a claim retroactively to the date of loss for claimant's failure to attend Independent Medical Examinations swhen, and as often as, the (Insurer) may reasonably requires (11 NYCRR 65-1.1) the attendance at the IME. The decision means that should your patient fail, without any justification, to appear at the IME or at the examination under oath all benefits will be denied entirely from the date of the accident. Furthermore, the assignment of benefits form that you signed will be null and void and you will be responsible to DRS Supply Inc for all bills.

Prior to my being seen by ARUNA SUPPLY INC., I executed an assignment of benefits form, whereby I directed the insurance company responsible of the payment of my medical expenses to pay ARUNA SUPPLY INC. directly, for services rendered. I understand that I am personally and fully responsible ARUNA SUPPLY INC. for the services rendered to me  This agreement is made solely for additional protection, and in consideration of AVISO Supply Inc., awaiting payments.

12/20/22
_____
Date

_____
Patient Name

_____
Patient's Signature

*The undersigned, being the attorney of record for the above patient does hereby acknowledge receipt of the above lien.*

_____
Date

_____
Attorney's Signature

Attorney:*Please date, sign and return one copy to our office
*Keep one copy for your records

---

## AVISO SUPPLY INC

1202 Avenue U,Brooklyn,NY
11229,# 1166
avisosupply@yahoo.com

### AUTHORIZATION OF DIRECT PAYMENTS AND LIEN

RE: Patient Records and lien

I do hereby authorize AVISO SUPPLY INC to furnish you, my attorney, with a full report of diagnostic test or any treatments performed on me in regard to the accident in which I was involved on    9/9/2022
authorize and direct you, my attorney, to pay directly to AVISO SUPPLY INC. such sums as may be necessary to adequately compensate AVISO SUPPLY INC. for medical services rendered to me by reason of this accident and by reason of any other bills that are due this office and to withhold such sums from any settlement, judgment or verdict as may be necessary to protect the interest of AVISO SUPPLY INC.

Please be advised that pursuant to a recent decision in 2006 NY Slip Op 9604 (App. Div., 2nd Dept.), an insurer is allowed to deny a claim retroactively to the date of loss for claimant's failure to attend Independent Medical Examinations swhen, and as often as, the (Insurer) may reasonably requires (11 NYCRR 65-1.1) the attendance at the IME. The decision means that should your patient fail, without any justification, to appear at the IME or at the examination under oath all benefits will be denied entirely from the date of the accident. Furthermore, the assignment of benefits form that you signed will be null and void and you will be responsible to DRS Supply Inc for all bills.

Prior to my being seen by AVISO SUPPLY INC., I executed an assignment of benefits form, whereby I directed the insurance company responsible of the payment of my medical expenses to pay AVISO SUPPLY INC. directly, for services rendered. I understand that I am personally and fully responsible AVISO SUPPLY INC. for the services rendered to me  This agreement is made solely for additional protection, and in consideration of AVISO Supply Inc., awaiting payments.

10/27/22
_____
Date

_____
Patient Name

_____
Patient's Signature

*The undersigned, being the attorney of record for the above patient does hereby acknowledge receipt of the above lien.*

_____
Date

_____
Attorney's Signature

Attorney:*Please date, sign and return one copy to our office
*Keep one copy for your records

**AVAMED SUPPLY INC**

*2619 Brown st. 2nd fl.*
*,Brooklyn ,NY ,11235; avamedsupply@gmail.com*

**AUTHORIZATION OF DIRECT PAYMENTS AND LIEN**

RE: Patient Records and lien

I do hereby authorize AVAMED SUPPLY INC to furnish you, my attorney, with a full report of diagnostic test or any test/exams performed on me in regard to the accident in which I was involved on          6.26.2022

I authorize and direct you, my attorney, to pay directly to AVAMED SUPPLY INC, such sums as may be necessary to adequately compensate AVAMED SUPPLY INC, for medical services rendered to me by reason of this accident and by reason of any other bills that are due this office and to withhold such sums from any settlement, judgment or verdict as may be necessary to protect the interest of AVAMED SUPPLY INC.

Please be advised that pursuant to a recent decision in 2006 NY Slip Op 6604 (App. Div., 2nd Dept), an erasure is allowed to a claim retroactively to the date of loss for claimant's failure to attend Independent Medical Examinations when, and as often as, the [insurer] may reasonably require [11 NYCRR 65-1.1] the attendance at the IME. The decision means that should your patient fail, without any justification, to appear at the IME or at the examination under oath all benefits will be denied entirely from the date of the accident. Furthermore, the assignment of benefits from that you signed will be null and void and you will be responsible to <mark>ERS Supply Inc</mark> for all bills

Prior to my being seen by AVAMED SUPPLY INC., I executed an assignment of benefits form, whereby I direct the insurance company responsible for the payment of my medical expenses to pay AVAMED SUPPLY INC. directly, for services rendered. I understand that I am personally and fully responsible AVAMED SUPPLY IND, for the services rendered to me. This agreement is made solely for additional protection, and in consideration of AVAMED Supply Inc., awaiting payments

_____   _____
Date  22/02/2323     Patient Name

_____   _____
                    Patient's Signature

*The undersigned, being the attorney of record for the above patient does*
*hereby acknowledge receipt of the above lien.*

_____   _____
Date                Attorney's Signature

*Attorney:*Please date, sign and return one copy to our office*
*Keep one copy for your records*

76.     In keeping with the fact that the Secret Owner actually owned, controlled, and profited from the Supplier Defendants, and used the Paper Owner Defendants to further the fraudulent scheme herein, there is significant overlap in the operations of the Supplier Defendants that could only exist and be accomplished through the Secret Owner's involvement.

77.     For example, the Supplier Defendants billed GEICO for purportedly providing Insureds with the same types of DME and OD, including using the same billing codes.

78.     As another example, the Supplier Defendants used overlapping Referring Providers that operated at Clinics where the Defendants obtained prescriptions for DME, including: (i) David Carmili, Viviane Etienne, Igor Zilberman, Colin Clarke, Sophia Muhuchy, Joseph Martone, Muhammed Zakaria, and Jordan Fersel.

79.     To maximize the amount of no-fault benefits the Defendants could receive while simultaneously attempting to avoid detection by GEICO, the Secret Owner along with the Paper

Owner Defendants and the Supplier Defendants to split up the billing that they were able to send to no-fault insurance carriers, including GEICO.

80.     Specifically, the Secret Owner opened A&D and Aviso on March 2, 2022, and used both providers to submit billing to GEICO for the Fraudulent Equipment until the early part of 2023. Once billing for those providers was in full swing, the Secret Owner opened Aruna and Alentus in October and December of 2022 respectively, and continued to have the Paper Owner Defendants submit billing under those providers until the middle of 2023. After the Secret Owner stopped using A&D and Aviso, they opened Avamed and Fastamed in February and April 2023 respectively and continued billing GEICO through those providers until August of 2023.

81.     Through this method, the Defendants were able to submit more than $2.2 million in billing to GEICO for the Fraudulent Equipment while keeping billing to between $200,000.00 and $400,000.00 for each individual Supplier Defendant. As a result of the fraudulent scheme, the Defendants received more than $630,000.00 from GEICO.

82.     GEICO attempted to verify the legitimacy of the Supplier Defendants by seeking verification and examinations under oath of the Supplier Defendants. However, as part of their goal to hide the scheme and the Secret Owner's involvement in the Supplier Defendants, they failed to appear for an examination under oath and failed to provide documentation to verify their legitimacy.

83.     Another way that the Defendants were able to perpetrate the fraudulent scheme against GEICO was by obtaining prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers because of secret agreements with third-party individuals who are not presently identifiable.

84.     Once the Defendants received the prescriptions purportedly issued by the Referring Providers, the Defendants would submit either NF-3 or HCFA-1500 forms to GEICO seeking reimbursement for specific types of Fee Schedule and Non-Fee Schedule items with HCPCS Codes that were not directly identified in the prescriptions or that differed from the HCPCS Codes that were identified in the prescriptions.

85.     By submitting bills to GEICO seeking No-Fault Benefits for Fraudulent Equipment based upon specific HCPCS Codes, the Defendants indicated that they provided Insureds with the particular item associated with each unique HCPCS Code, and that such specific item was medically necessary as determined by a Referring Provider, who was licensed to prescribe DME and/or OD.

86.     However, the Defendants also tried to maximize the amount of No-Fault Benefits that they could obtain from GEICO by submitting bills to GEICO that misrepresented the Fraudulent Equipment purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

87.     In a substantial majority of the charges for Fraudulent Equipment identified in Exhibits "1" through "7" – to the extent that any Fraudulent Equipment was actually provided to the Insureds – the Fraudulent Equipment did not match the HCPCS Codes identified in the bills submitted to GEICO by the Defendants.

88.     The Defendants also engaged in a pattern of submitting bills to GEICO, and other automobile insurers, seeking No-Fault Benefits based on HCPCS Codes that did not accurately represent – sometimes in any way – the Fraudulent Equipment purportedly provided to the Insureds in order to obtain higher reimbursement rates than what was permissible.

89.     In furtherance of their scheme to defraud GEICO, and other automobile insurers, the Defendants also submitted bills for Non-Fee Schedule items that falsely indicated they were seeking reimbursement at the <u>lesser</u> of 150% of the Defendants' legitimate acquisition cost or the cost to the general public for the same item.

90.     In actuality, the bills from the Defendants submitted to GEICO for Non-Fee Schedule items contained grossly inflated reimbursement rates that did not accurately represent the lesser of 150% of the Defendants' legitimate acquisition cost or the cost to the general public.

91.     The Defendants submitted bills to GEICO, and other automobile insurers, seeking No-Fault Benefits for Fraudulent Equipment at rates that were grossly above the permissible reimbursement amount for Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits that they could receive.

92.     After obtaining the vague and generic prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers as a result of paying various forms of consideration, the Defendants would bill GEICO for: (i) Fraudulent Equipment that was not reasonable or medically necessary; (ii) Fraudulent Equipment that was not based on valid prescriptions from licensed healthcare providers; (iii) Fraudulent Equipment that did not represent the HCPCS codes contained in the bills to GEICO; (iv) Fraudulent Equipment  at grossly inflated reimbursement rates; and (v) Fraudulent Equipment that was otherwise not reimbursable.

93.     Through the complex multi-corporation scheme, the Secret Owner and the Paper Owner Defendants used the Supplier Defendants to bill and collect No-Fault Benefits from GEICO and other automobile insurers that they were never entitled to collect.

94.     More specifically:

(i)     Since November 2022, Aruna billed GEICO approximately $385,000.00, has wrongfully obtained more than $105,000.00 from GEICO, and there is

more than $217,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

(ii) Since March 2022, A&D billed GEICO approximately $240,000.00, has wrongfully obtained more than $94,000.00 from GEICO, and there is more than $81,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

(iii) Since February 2022, Aviso billed GEICO approximately $296,000.00, has wrongfully obtained more than $77,000.00 from GEICO, and there is more than $130,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

(iv) Since September 2020, DRS billed GEICO approximately $357,000.00 has wrongfully obtained more than $180,000.00 from GEICO, and there is more than $104,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

(v) Since January 2023, Alentus billed GEICO approximately $210,000.00 has wrongfully obtained more than $42,000.00 from GEICO, and there is more than $137,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO;

(vi) Since May 2023, Fastamed billed GEICO approximately $354,000.00 has wrongfully obtained more than $72,000.00 from GEICO, and there is more than $242,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO; and

(vii) Since March 2023, Avamed billed GEICO approximately $407,000.00 has wrongfully obtained more than $55,000.00 from GEICO, and there is more than $312,000.00 in additional fraudulent claims that have yet to be adjudicated, but which the Defendants continue to seek payment of from GEICO.

**B.     Defendants Failure to Comply with Local Licensing Provisions**

95.     As stated above, for a DME/OD supplier to provide DME or OD to automobile accident victims within the City of New York, the DME/OD supplier must receive a Dealer in Products License from the DCWP.

96.     For the Defendants to lawfully provide DME/OD to the Insureds identified in Exhibits "1" through "7", the DME Providers were required to obtain a Dealer in Products License because an overwhelming majority of the Insureds identified in Exhibits "1" through "10" were located within the City of New York.

97.     As part of the Defendants scheme to defraud GEICO and other Insurers, the Defendants sought Dealer in Products Licenses from the DCWP for all of the Supplier Defendants, with the exception of Fastamed, to create the appearance that they were legitimate.

98.     However, each of the DME Providers were not eligible to collect No-Fault Benefits from GEICO, and other automobile insurers, because they were never lawfully licensed by the DCWP to provide DME or OD to Insureds.

99.     For example, Fastamed, was not eligible to collect No-Fault Benefits because Fastamed never obtained a Dealer in Products license from the DCWP.

100.    Unlike for the other Supplier Defendants, the Secret Owner did not even attempt to apply for a Dealer in Products License with the DCWP for Fastamed so it was never properly licensed to provide DME/OD to accident victims residing in New York City.

101.    In addition, all the other Supplier Defendants were not lawfully licensed by the DCWP because they obtained Dealer in Products licenses under false pretenses.

102.    As part of obtaining a Dealer in Products License, each of the Supplier Defendants completed a license application form that required the Supplier Defendants to identify – among other things – each individual that owned more than 10% of the respective Supplier Defendant.

103.    Each Dealer in Products License contains an affirmation to be signed with a penalty for false statements under Sections 175.30, 175.35, and 210.45 of New York's Penal Law.

104.    However, each of the Supplier Defendants, except Fastamed, lied in their application for a Dealer in Products license by falsely identifying all owners of each Supplier Defendant.

105.    For example, on November 24, 2021, Bakhramov applied for a Dealer in Products license on behalf of DRS and affirmed, under penalty for false statements, that he was the sole owner of DRS.

106.    However, as set forth above, Bakhramov was only the paper owner of DRS, and DRS was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through DRS.

107.    On March 7, 2022, Mavashev applied for a Dealer in Products license on behalf of A&D and affirmed, under penalty for false statements, that he and Bakhramov were the sole owners of A&D.

108.    In reality, as set forth above, Mavashev and Bakhramov were only paper owners of A&D, and A&D was actually controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through A&D.

109.    Also on March 7, 2022, Sorokin applied for a Dealer in Products license on behalf of Aviso and affirmed, under penalty for false statements, that he was the sole owner of Aviso.

110.    However, as set forth above, Sorokin was only the paper owner of Aviso, and Aviso was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Aviso.

111.    On November 6, 2022, Mavashev applied for a Dealer in Products license on behalf of Aruna and affirmed, under penalty for false statements, that he was the sole owner of Aruna.

112.     In reality, as set forth above, Mavashev was only paper owners of Aruna, and Aruna was actually controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Aruna.

113.     On January 4, 2023, Sorokin applied for a Dealer in Products license on behalf of Alentus and affirmed, under penalty for false statements, that he was the sole owners of Alentus.

114.     However, as set forth above, Sorokin was only the paper owner of Alentus, and Alentus was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Alentus.

115.     On February 28, 2023, Sorokin applied for a Dealer in Products license on behalf of Avamed and affirmed, under penalty for false statements, that he was the sole owner of Avamed.

116.     However, as set forth above, Sorokin was only the paper owner of Avamed, and Avamed was actually owned and controlled by the Secret Owner, who is not presently identifiable to GEICO and directly profited from the fraudulent scheme committed through Avamed.

117.     The Supplier Defendants never properly obtained Dealer in Products Licenses and were not lawfully permitted to sell, rent, fit, or adjust any DME or OD for Insureds within the City of New York.

118.     Accordingly, Defendants were never entitled to receive No-Fault Benefits because they failed to comply with all significant statutory and regulatory requirements by operating as a DME/OD supplier within the City of New York without a valid Dealer in Products License.

119.     In each of the claims identified in Exhibits "1" through "7" the Defendants fraudulently misrepresented that they were properly licensed with all local statutory and regulatory requirements and were lawfully permitted to provide DME/OD to Insureds when the Defendants

were never eligible to collect No-Fault Benefits in the first instance because the Supplier Defendants did not lawfully obtain Dealer in Products Licenses.

### C.    The Defendants' Illegal Financial Arrangements

120.    To obtain access to Insureds so the Defendants could implement and execute their fraudulent scheme and maximize the amount of No-Fault Benefits the Defendants could obtain from GEICO and other New York automobile insurers, the Defendants entered into unlawful financial agreements with others who are not presently identifiable (e.g., John Doe Defendants) where prescriptions for Fraudulent Equipment were provided to the Defendants in exchange for financial consideration.

121.    Since the Paper Owner Defendants' fraudulent scheme's inception, the Defendants have engaged in unlawful financial arrangements with others who are not presently identifiable in order to obtain prescriptions for Fraudulent Equipment. These schemes allowed the Defendants to submit thousands of claims for Fraudulent Equipment to GEICO and other New York automobile insurers in New York.

122.    As part of the unlawful financial arrangements, the Defendants would pay thousands of dollars in illegal kickback payments to others, including fictitious businesses, to obtain prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers.

123.    The Defendants were able to enter unlawful financial arrangement schemes with others who are not presently identifiable in order to obtain prescriptions purportedly issued by the Referring Providers because the Referring Providers operated at Clinics that are actually organized as "one-stop" shops for no-fault insurance fraud.

124.    These Clinics provide facilities for the Referring Providers, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations,

physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

125.    At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working at the Clinics, developed and controlled the patient base.  The Clinics willingly provided patient access to healthcare providers – and prescriptions to DME companies, like the Supplier Defendants, in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

126.    In keeping with the fact that some of the Clinics where the Defendants participated in illegal kickbacks to obtain prescriptions for Fraudulent Equipment, some of the Clinics that were sources for the prescriptions used by the Defendants have been the subject of a recent federal indictment involving numerous individuals who allegedly paid monies to hospitals, medical providers and others for confidential patient information, and the patients would be contacted and "referred" for medical treatment from a select network of medical clinics (and lawyers) in New York and New Jersey that paid kickbacks to the indicted individuals. See United States of America v. Anthony Rose, et al., 19-cr-00789(PGG)(S.D.N.Y. 2019).

127.    In USA v. Rose, numerous individuals were indicted in November 2019 for paying bribes to 911 operators, medical personnel, NYPD officers, and others in exchange for confidential patient information. To exploit the patient information, Anthony Rose ("Rose"), the ringleader of the scheme, set up a fully staffed call center in order to contact the patients and to steer them to a preferred network of medical clinics (and lawyers) in New York and New Jersey.  Specifically, the medical clinics, including at least one of the Clinics where the Defendants operated, were deemed preferred because the clinic controllers paid Rose kickbacks in exchange for the referrals.

128.    Recently, Government affidavits filed in support of surveillance warrants, including wiretaps, were unsealed in USA v. Rose. These affidavits detail the massive scope of the patient brokering scheme, reveal the identity of numerous layperson controllers and fraudulent clinic locations, and expressly implicate at least three Clinics where the Defendants obtained prescriptions for Fraudulent Equipment. See USA v. Rose, ECF No. 398.

129.    For example, the Clinic located at 69-37 Myrtle Avenue, Glendale, NY ("Myrtle Avenue Clinic") is one of the Clinics identified in USA v. Rose that was involved in the illegal kickback scheme. The Myrtle Avenue Clinic is also the source for prescriptions for Fraudulent Equipment that A&D, Alentus, and Fastamed used to submit billing to GEICO.

130.    Additionally, the Clinic located at 719 Southern Boulevard, Bronx, NY (the "Southern Blvd Clinic") was another Clinic identified in USA v. Rose that was involved in the illegal kickback scheme.  The Southern Blvd Clinic is also the source for prescriptions for Fraudulent Equipment that Aruna and Avamed used to submit billing to GEICO.

131.    As another example, the Clinic located at 488 Lafayette Avenue, Bronx, NY ("Lafayette Avenue Clinic") is one of the Clinics identified in USA v. Rose that was involved in the illegal kickback scheme. The Lafayette Avenue Clinic is also the source for prescriptions for Fraudulent Equipment that Avamed used to submit billing to GEICO.

132.    Pursuant to the unlawful financial arrangements, the Defendants paid others that are not presently known, and who were able to direct prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers to the Defendants, which the Defendants used as a basis to support their fraudulent bills to GEICO.

133.    In support of the fact that the prescriptions for Fraudulent Equipment were the result of unlawful financial arrangements, and as explained in detail below, the prescriptions were not

medically necessary, were provided pursuant to predetermined fraudulent protocols that provided Insureds with predetermined sets of virtually identical Fraudulent Equipment, and frequently never actually issued by the Referring Provider.

134.   In also keeping with the fact that the Defendants obtained prescriptions for Fraudulent Equipment that were not medically unnecessary and were provided as a result of unlawful financial arrangements, the Defendants: (i) received virtually identical predetermined sets of prescriptions from multiple Referring Providers operating out of the same Clinic; (ii) routinely received prescriptions for Fraudulent Equipment containing stamped signatures that were purportedly issued by but never actually signed, authorized, or otherwise issued by the Referring Providers; and (iii) obtained prescriptions for Fraudulent Equipment directly from the Clinics without any communication with or involvement by the Insureds.

135.   Furthermore, and to the extent that the Insureds received any Fraudulent Equipment, the Insureds were provided with Fraudulent Equipment directly from the Clinics without any interaction with the Defendants.

136.   In all of the claims identified in Exhibits "1" through "7" the Defendants falsely represented that Fraudulent Equipment was provided pursuant to lawful prescriptions from healthcare providers and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were provided pursuant to unlawful financial arrangements.

**D.   The Prescriptions Obtained Pursuant to Predetermined Fraudulent Protocols**

137.   In addition to the Defendants' unlawful financial arrangements, pursuant to agreements with others who are not presently identifiable, the Defendants obtained prescriptions for Fraudulent Equipment purportedly issued by pursuant to predetermined fraudulent protocols,

which were designed to maximize the billing that the Defendants – and others – could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds.

138.    In the claims identified in Exhibits "1" through "7", virtually all of the Insureds were involved in relatively minor and low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

139.    Concomitantly, almost none of the Insureds identified in Exhibits "1" through "7", whom the Referring Providers purported to treat, suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

140.    In keeping with the fact that the Insureds identified in Exhibits "1" through "7" suffered only minor injuries – to the extent that they had any injuries at all – as a result of the relatively minor accidently, many of the Insureds did not seek treatment at any hospital as a result of their accidents.

141.    To the extent that the Insureds in the claims identified in Exhibits "1" through "7" did seek treatment at a hospital following their accidents, they virtually always were briefly observed on an outpatient basis, and then discharged with nothing more serious than a minor soft tissue injury such as a sprain or strain.

142.    However, despite virtually all of the Insureds being involved in relatively minor and low-impact accidents and only suffering from sprains and strains – to the extent that the Insureds were actually injured – virtually all of the Insureds who treated with each of the Referring Providers were subject to extremely similar treatment including nearly identical prescriptions for Fraudulent Equipment.

143.    The prescriptions for Fraudulent Equipment that were purportedly issued to the Insureds identified in Exhibits "1" through "7" were issued pursuant to predetermined fraudulent

protocols set forth at each Clinic, not because the Fraudulent Equipment was medically necessary for each Insured based upon his or her individual symptoms or presentations.

144. No legitimate physician, chiropractor, other licensed healthcare provider, or professional entity would permit prescriptions for Fraudulent Equipment to be issued based upon the fraudulent protocols described below.

145. In general, the Defendants obtained prescriptions for medically unnecessary Fraudulent Equipment purportedly issued by the Referring Providers pursuant to the following predetermined fraudulent protocols:

> (i)    an Insured would arrive at a Clinic for treatment subsequent to a motor vehicle accident;
>
> (ii)   the Insured would be seen by a Referring Provider;
>
> (iii)  on the date of the first visit, the Referring Provider would direct the Insured to undergo conservative treatment and purportedly provide a prescription for a set of DME and/or OD;
>
> (iv)   subsequently, the Insured would return to the Clinic for one or more additional evaluations and treatment by other healthcare providers, and would be provided with at least one additional prescription for a predetermined set of DME and/or OD, although the Referring Provider did not always treat the Insured on the date of the additional prescription for DME and/or OD; and
>
> (v)    at least one, if not more than one, prescription for DME and/or OD would be directly provided to the Defendants to fill and was filled without any involvement by the Insured.

146. Virtually all of the claims identified in Exhibits "1" through "7" are based upon medically unnecessary prescriptions for predetermined sets of Fraudulent Equipment, which were purportedly issued by the Referring Providers who practiced at various Clinics across the New York metropolitan area.

147. In a legitimate setting, when a patient injured in a motor vehicle accident seeks treatment by a healthcare provider, the patient's subjective complaints are evaluated, and the

treating provider will direct a specific course of treatment based upon the patient's individual symptoms or presentation.

148.     Furthermore, in a legitimate setting, during the course of a patient's treatment, a healthcare provider <u>may</u> – but not always – prescribe DME and/or OD that should aid in the treatment of the patient's symptoms.

149.     In determining whether to prescribe DME and/or OD to a patient – in a legitimate setting – a healthcare provider should evaluate multiple factors, including: (i) whether the specific DME and/or OD could have any negative effects based upon the patient's physical condition and medical history; (ii) whether the DME and/or OD is likely to help improve the patient's complained of condition; and (iii) whether the patient is likely to use the DME and/or OD. In all circumstances, any prescribed DME and/or OD would always directly relate to each patient's individual symptoms or presentation.

150.     There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident. For example, an individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

151.     If a healthcare provider determines that DME and/or OD is medically necessary after considering a patient's individual circumstances and situations, in a legitimate setting, the healthcare provider would indicate in a contemporaneous medical record, such as an evaluation report, what specific DME and/or OD was prescribed and why any of the prescribed Fraudulent Equipment was medically necessary or how it would help the Insured.

152.    It is improbable – to the point of impossibility – that virtually all of the Insureds identified in Exhibits "1" through "7" who treated with different Referring Providers at different Clinics would receive virtually identical prescriptions for numerous items of Fraudulent Equipment despite being different ages, in different physical conditions, and involved in different motor vehicle accidents.

153.    Here, and in keeping with the fact that the prescriptions provided to the Defendants were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, virtually all of the Insureds identified in Exhibits "1" through "7" that treated at specific Clinics were issued extremely similar prescriptions for a predetermined set of Fraudulent Equipment.

154.    In keeping with the fact that the prescriptions for Fraudulent Equipment used by the Defendants to support the charges identified in Exhibits "1" through "7" were for medically unnecessary Fraudulent Equipment obtained as part of predetermined fraudulent protocols, many of the prescriptions were purportedly issued on dates that the Insureds never treated with the Referring Providers who purportedly issued the prescription.

155.    Also, in keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "7" were issued pursuant to predetermined fraudulent protocols, and not for the benefit of the Insureds – as set forth below – the Referring Providers all issued similar checkmark-based prescriptions and routinely issued multiple checkmark-based prescriptions to a single patient on the same day when there was no legitimate reason to do so.

156.    In further keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and were provided pursuant to predetermined fraudulent protocols, to the extent that there was a contemporaneously dated evaluation report, the evaluation report

virtually always failed to explain – and oftentimes failed to identify – the Fraudulent Equipment identified on the prescriptions provided to the Defendants and used by the Defendants to bill GEICO for the charges identified in Exhibits "1" through "7".

157.     In further keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to the Insureds identified in Exhibits "1" through "7" were not medically necessary but were the result of predetermined fraudulent protocols, the prescriptions typically contained vague and generic descriptions for DME and OD, which – as explained in more detail below – provided the Defendants with the opportunity to purportedly provide – and bill GEICO for – whatever DME or OD they wanted.

158.     Further evidence of the lack of medical necessity for the Fraudulent Equipment is the fact and the Insureds often did not even receive the Fraudulent Equipment, to the extent they received any at all, from the Supplier Defendants for several weeks, sometimes even months, after the prescription was written.

159.     For example:

(i)      An Insured named TH allegedly received a prescription from Quais Sayeed, M.D. ("Sayeed") on June 6, 2022, however, A&D did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until August 23, 2022, 78 days later.

(ii)     An Insured named NH allegedly received a prescription from Muhammad Zakaria, M.D. ("Zakaria") for Fraudulent Equipment on May 16, 2022, however, Aviso did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until July 30, 2022, 75 days later.

(iii)    An Insured named SR allegedly received a prescription from Jennifer Honor, D.C. ("Honor") for Fraudulent Equipment on January 5, 2022, however, DRS did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until March 7, 2022, 61 days later.

(iv)      An Insured named DS allegedly received a prescription from David Carmili, M.D. ("Carmili") for Fraudulent Equipment on July 26, 2022, however, Aviso did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until September 7, 2022, 43 days later.

(v)      An Insured named LC allegedly received a prescription from Sayeed for Fraudulent Equipment on January 31, 2022, however, A&D did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until March 12, 2022, 40 days later.

(vi)      An Insured named CG allegedly received a prescription from Honor for Fraudulent Equipment on May 9, 2021, however, DRS did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until June 15, 2021, 37 days later.

(vii)      An Insured named JC allegedly received a prescription from Sophia Mohuchy, M.D.("Mohuchy") on November 29, 2022 for Fraudulent Equipment, however, Alentus did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until January 5, 2023, 37 days later.

(viii)      An Insured named SMG allegedly received a prescription from Mario Leon, P.A. ("Leon") on March 29, 2023 for Fraudulent Equipment, however, Fastamed did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until May 4, 2023, 36 days later.

(ix)      An Insured named SMF allegedly received a prescription from Igor Zilberman, M.D. ("Zilberman") for Fraudulent Equipment on February 8, 2023, however, Avamed did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until March 3, 2023, 23 days later.

(x)      An Insured named MM allegedly received a prescription from Dominic Mazza, D.C. ("Mazza") on December 15, 2022, however, Aruna did not provide the Fraudulent Equipment – to the extent they provided any Fraudulent Equipment – until January 6, 2023, 22 days later.

160.    Even more, and as also explained below in more detail, the charges to GEICO identified in Exhibits "1" through "7" were not based upon prescriptions for medically necessary Fraudulent Equipment because the Defendants purportedly provided Insureds with whatever DME or OD that they wanted, even when the Fraudulent Equipment purportedly provided – and billed

to GEICO – was not the item identified in the prescriptions purportedly issued by the Referring Providers.

161.    In further keeping with the fact that the prescriptions for Fraudulent Equipment identified in Exhibits "1" through "7" were issued because of predetermined fraudulent protocols and not based upon medical necessity, the prescriptions purportedly issued by the Referring Providers were never given to the Insureds.

162.    Instead, upon information and belief, the Insureds were provided with Fraudulent Equipment directly from the Clinic's receptionists without any choice of what DME provider would provide their equipment and without any interaction from the Defendants – to the extent that the Insureds actually received any Fraudulent Equipment.

163.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "7", the Defendants falsely represented that Fraudulent Equipment was provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and where therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

**E.    Predetermined Fraudulent Protocols Implemented at the Clinics**

164.    As with the listed owner and premise address for the Supplier Defendants, the Defendants attempted to diversify the Referring Providers from whom each of the Supplier Defendants received their prescriptions in an effort to make each Supplier Defendant appear separate and distinct.

165.    In order to do this, the Defendants conspired with individuals associated with the Clinics who are not presently identifiable to obtain medically unnecessary prescriptions for Fraudulent Equipment pursuant to predetermined fraudulent protocols.

166.    After their involvement in minor "fender-bender" motor vehicle accidents, many of the Insureds identified in Exhibits "1" – "7" purportedly received treatment from a variety of healthcare professionals who operated out of the various Clinics.

167.    Virtually every Insured identified in Exhibits "1" – "7" who purportedly received was purportedly provided with an initial examination from a healthcare provider at one the Clinics. After their purported initial examination, each of the Insureds were prescribed multiple items of Fraudulent Equipment.

168.    When the Insureds sought treatment with and were purportedly provided with an initial evaluation by healthcare providers at the Clinics, they did not evaluate each Insured's individual symptoms or presentation to determine whether and what type of DME and/or OD to provide.

169.    Rather, Referring Providers purportedly issued prescriptions for a predetermined set of Fraudulent Equipment to each Insured after a purported initial examination based upon a predetermined fraudulent protocol.

170.    In keeping with the fact that the prescriptions issued by the Referring Providers at the Clinics subsequent to purported initial examinations were not medically necessary and were provided pursuant to the predetermined fraudulent protocol, virtually every Insured who underwent an initial examination was issued a prescription for virtually the same type of Fraudulent Equipment, regardless of which Referring Provider purportedly issued the prescription.

171.    Regardless of the type of motor vehicle accident, the age of each patient, each patient's physical condition, each patient's subjective complaints, or whether each patient would actually use the Fraudulent Equipment, after a purported initial examination, Referring Providers virtually always prescribed the following Fraudulent Equipment to virtually all the Insureds identified in Exhibits "1" through "7" that they treated: (i) a LSO back support; (ii) a cervical collar; (iii) a cervical traction unit; (iv) a neuromuscular stimulator; and (v) an egg crate mattress.

172.    For example, two Referring Providers, Camili and Zakaria, purported to treat Insureds at the Myrtle Avenue Clinic and a Clinic located at 3432 E. Tremont Avenue, Bronx, NY ("Tremont Avenue Clinic"), and both issued substantially similar prescriptions for Fraudulent Equipment that were then used by A&D, Aviso, Fastamed, and Alentus to bill GEICO.

173.    An example of extremely similar prescriptions issued by Carmili include:

(i)    An Insured named GAL was involved in an automobile accident on April 23, 2022. On or around April 27, 2022, GAL purportedly went to the Myrtle Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by A&D, including the following: (1) shoulder orthosis; (2) cervical collar; (3) over-bed table; (4) mattress; (5) LSO; and (6) neuromuscular stimulator.

(ii)    An Insured named RD was involved in an automobile accident on April 13, 2022. On or around May 3, 2022, RD purportedly went to the Tremont Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Aviso, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; (5) neuromuscular stimulator; and (6) another LSO.

(iii)    An Insured named MB was involved in an automobile accident on April 21, 2022. On or around May 3, 2022, MB purportedly went to the Tremont Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Aviso, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) shoulder orthosis; and (5) neuromuscular stimulator.

(iv)    An Insured named IA was involved in an automobile accident on June 6, 2022. On or around June 9, 2022, IA purportedly went to the Tremont

Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Aviso, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar.

(v)   An Insured named HJ was involved in an automobile accident on June 6, 2022. On or around June 14, 2022, HJ purportedly went to the Tremont Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Aviso, including the following: (1) mattress; (2) over-bed table; (3) cervical collar; (4) shoulder orthosis; and (5) neuromuscular stimulator.

(vi)   An Insured named WW was involved in an automobile accident on July 4, 2022. On or around August 17, 2022, WW purportedly went to the Tremont Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by A&D, including the following: (1) LSO; (2) cervical traction device; (3) neuromuscular stimulator; (4) cervical collar; (5) over-bed table; and (6) mattress.

(vii)   An Insured named MM was involved in an automobile accident on November 22, 2022. Afterwards, MM purportedly went to the Myrtle Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Alentus, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; (5) neuromuscular stimulator; and (6) shoulder orthosis.

(viii)   An Insured named JP was involved in an automobile accident on November 12, 2022. Afterwards, JP purportedly went to the Myrtle Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Alentus including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; and (5) neuromuscular stimulator.

(ix)   An Insured named SC was involved in an automobile accident on April 24, 2023. On or around April 26, 2023, SC purportedly went to the Myrtle Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for following Fraudulent Equipment that was billed by Fastamed: (1) over-bed table; (2) mattress; (3) cervical collar: (4) LSO; and (5) neuromuscular stimulator.

(x)   An Insured named AL was involved in an automobile accident on May 1, 2023. On or around May 3, 2023, AL purportedly went to the Myrtle Avenue Clinic and received treatment from Carmili, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Fastamed: (1) over-bed table; (2) cervical collar; (3) mattress; (4) LSO; (5) neuromuscular stimulator; and (6) shoulder orthosis.

174. Despite not having any connection on-paper affiliation to Carmili, and Carmili's practice - All Boro Medical Services, P.C. – Zakaria purportedly issued prescriptions for DME – while operating out of the Myrtle Avenue Cinic and Tremont Avenue Clinic – that were substantially similar to the prescriptions for DME issued by Carmili and used by some of the Supplier Defendants to bill GEICO.

175. For example:

(xi)   An Insured named IB was involved in an automobile accident on December 22, 2021. On or around December 23, 2021, IB purportedly went to the Tremont Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Aviso: (1) LSO; (2) knee orthosis; (3) shoulder orthosis; and (4) cervical traction device.

(xii)  An Insured named SM was involved in an automobile accident on February 3, 2022. On or around February 8, 2022, SM purportedly went to the Tremont Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Aviso: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; and (5) shoulder orthosis.

(xiii) An Insured named KG was involved in an automobile accident on January 14, 2022. On or around February 15, 2022, KG purportedly went to the Tremont Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Aviso: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; and (5) cervical collar.

(xiv)  An Insured named GNB was involved in an automobile accident on February 11, 2022. On or around March 9, 2022, GNB purportedly went to the Myrtle Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by A&D: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; and (5) shoulder orthosis.

(xv)   An Insured named NR was involved in an automobile accident on March 2, 2022. On or around March 22, 2022, NR purportedly went to the Myrtle Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by A&D: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; (5) shoulder orthosis; and (6) cervical collar.

(xvi)   An Insured named AJPL was involved in an automobile accident on March 13, 2022. On or around March 22, 2022, AJPL purportedly went to the Myrtle Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by A&D: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; and (5) shoulder LSO.

(xvii)  An Insured named KA was involved in an automobile accident on March 22, 2022. On or around March 24, 2022, KA purportedly went to the Tremont Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Aviso: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; and (5) additional LSO.

(xviii) An Insured named MF was involved in an automobile accident on March 27, 2022. On or around March 29, 2022, MF purportedly went to the Tremont Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Aviso: (1) LSO; (2) mattress; (3) over-bed table; (4) neuromuscular stimulator; (5) cervical collar; and (6) shoulder orthosis.

(xix)   An Insured named MG was involved in an automobile accident on March 18, 2022. On or around April 19, 2022, MG purportedly went to the Myrtle Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by A&D: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; and (5) additional LSO.

(xx)    An Insured named SGV was involved in an automobile accident on March 20, 2022. On or around April 19, 2022, SGV purportedly went to the Myrtle Avenue Clinic and received treatment from Zakaria, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by A&D: (1) LSO; (2) mattress; (3) over-bed table; and (4) neuromuscular stimulator.

176.   In further keeping with the fact that the prescriptions issued to the Insureds by Referring Providers at the Clinics after purported initial examinations were not medically necessary and were issued pursuant to predetermined fraudulent protocols, Alentus, Avamed, and Fastamed, received prescriptions issued from several Referring Providers associated with Atlantic Medical & Diagnostic P.C. ("Atlantic Medical") at a variety of Clinics for substantially similar

prescriptions for Fraudulent Equipment that did not appear to be based upon each patient's individual circumstance.

177.    For example:

(i)    An Insured named FSFT was involved in an automobile accident on November 9, 2022. Afterwards, FSFT purportedly went to the 1894 Eastchester Road, Bronx, NY ("Eastchester Clinic") and received treatment from Amira Nasser, P.A. ("Nasser") on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Avamed, including the following: (1) LSO; and (2) shoulder orthosis.

(ii)    An Insured named BB was involved in an automobile accident on November 19, 2022. On or around November 29, 2022 BB purportedly went to the 219 Hempstead Turnpike, West Hempstead, NY ("Hempstead Clinic") and received treatment from Leon on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Alentus, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; (5) cervical traction device; and (6) massager.

(iii)    An Insured named JM was involved in an automobile accident on December 3, 2022. On or around December 13, 2022, JM purportedly went to a Clinic located at the Hempstead Clinic and received treatment from Leon on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Alentus, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; (5) cervical traction device; and (6) massager.

(iv)    An Insured named RM was involved in an automobile accident on December 7, 2022. Afterwards, RM purportedly went to the Eastchester Clinic and received treatment from Viviane Etienne, M.D. ("Etienne") on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Avamed, including the following: (1) LSO; and (2) cervical traction device.

(v)    An Insured named JS was involved in an automobile accident on December 15, 2022. On or around January 19, 2023 JS purportedly went to a Clinic located at 1647 Macombs Road, Bronx NY ("Macombs Clinic") and received treatment from Joseph Martone, P.A. ("Martone") on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Alentus, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; and (5) massager.

(vi)    An Insured named GH was involved in an automobile accident on January 15, 2023. Afterwards, GH purportedly went to the Macombs Clinic and was

issued a prescription purportedly issued by Martone on behalf of Atlantic Medical for Fraudulent Equipment that was billed by Alentus, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; and (5) massager.

(vii)   An Insured named AT was involved in an automobile accident on January 23, 2023. Afterwards, AT purportedly went to a Clinic located at 37-23 72nd Street Jackson Heights, NY ("72nd Street Clinic") and received treatment from Nasser on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Avamed, including the following: (1) LSO; (2) mattress; (3) cervical collar; and (4) heating pad.

(viii)   An Insured named JG was involved in an automobile accident on February 10, 2023. Afterwards, JG purportedly went to a Clinic located at the Eastchester Clinic and received treatment from Etienne on behalf of Atlantic Medical, who purportedly issued prescriptions for Fraudulent Equipment that was billed by Avamed, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) cervical collar; (5) neuromuscular stimulator; and (6) heat lamp.

(ix)   An Insured named RL was involved in an automobile accident on April 26, 2023. On or around May 2, 2023, RL purposedly went to the Hempstead Clinic and received treatment from Leon on behalf of Atlantic Medical, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Fastamed, including the following: (1) LSO; (2) mattress; (3) over-bed table; (4) general wheelchair back cushion; and (5) cervical collar.

(x)   An Insured named DW was involved in an automobile accident on May 1, 2023. On or around May 2, 2023, DW purportedly went to the Hempstead Clinic and received treatment from Leon on behalf of Atlantic Medical, who purportedly issued prescriptions for the following Fraudulent Equipment that was billed by Fastamed, including the following: (1) LSO; (2) mattress; (3) over-bed table; and (4) general wheelchair back cushion.

178.   In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued by the Referring Providers were not medically necessary and were issued pursuant to pre-determined fraudulent protocols, many of the Referring Providers have been involved in their own participation in insurance fraud schemes.

179.    For example, Mohuchy has been sued no less than four times for her alleged involvement with no-fault insurance fraud schemes. See Allstate Ins. Co. et. al. v. Mohuchy, D.C. et al., 1:15-cv-05556-ERK-CLP; Allstate Ins. Co. et al. v. Flow Chiropractic P.C. et al., 1:15-cv-03638-JBW-MDG; Allstate Ins, Co. v. A&F Medical P.C. et al., 1L14-cv-06756-ENV-RLM; Liberty Ins. Corp. et al. v. Mohuchy, D.S. et al., 1L14-cv-02168-SJ-JO.

180.    Similarly, Etienne has been sued no less than three times for her alleged involvement with no-fault insurance fraud schemes. See Gov't Emp. Ins. Co. et al. v. Wellmart RX et al., 1:19-cv-o4414-KAM-RLM; Gov't Emp. Ins. Co. et al.  v. Dublin et al., 1:11-cv-04018-PKC-RER; Allstate Ins. Co. et al. v. Etienne et al..

181.    To the extent that the Insureds identified in Exhibits "1" through "7" returned to the Clinics and purportedly underwent follow-up examinations by a Referring Provider, the Insureds would frequently be provided at least one, and oftentimes two or more additional prescriptions for virtually identical Fraudulent Equipment that were provided to the Defendants or other DME providers, regardless which Referring Provider issued the prescription.

182.    When the Insureds identified in Exhibits "1" through "7" were prescribed Fraudulent Equipment after purported follow-up examinations, to the extent that Insureds were prescribed multiple pieces of DME, the Referring Providers would often issue separate prescriptions for each of these items on a single date that would be provided to the Defendants or other DME providers.

183.    In keeping with the fact that the prescriptions for Fraudulent Equipment purportedly issued to Insureds were medically unnecessary and were provided to the Defendants pursuant to a predetermined fraudulent protocol, there was no legitimate reason for a single Referring Provider to issue multiple prescriptions for Fraudulent Equipment to a single Insured on the same date when

the multiple prescriptions for Fraudulent Equipment could have easily been provided on one single prescription as each prescription used the same checkmark-based form containing a list of DME/OD.

184.   There is no legitimate reason why any healthcare provider would need to issue multiple prescriptions to an individual Insured on a single date that used the same checkmark-based form. Even more, there is no legitimate reason why this would occur for a substantial amount of the Insureds identified in Exhibits "1" through "7".

185.   In further keeping with the fact that the prescriptions for medically unnecessary Fraudulent Equipment purportedly issued to Insureds by the Referring Providers pursuant to a predetermined fraudulent protocol, many Insureds were issued at least one prescription for Fraudulent Equipment that was dated on a day that the Insured was not examined or otherwise treated by the Referring Provider who purportedly issued the prescription.

186.   For example:

(i)     On January 28, 2022, an Insured named KB was involved in a motor vehicle accident, and purportedly started treating with Nicholas Fennelli ("Fennelli") on or around February 1, 2022. Roughly, three and a half months later, Fenelli purportedly issued a prescription for KB that was provided to DRS for an LSO despite Fennelli not performing an examination or any other service for KB on that date.

(ii)    On February 14, 2022, an Insured named RR was involved in a motor vehicle accident, and purportedly started treating with Zakaria on or around February 17, 2022. Approximately three and a half months later, Zakaria purportedly issued a prescription for RR that was provided to Aviso for (i) LSO, (ii) shoulder orthosis, and (iii) cervical traction device despite Zakaria not performing an examination or other service on RR on that date.

(iii)   On March 18, 2022 three Insureds named CA, DRP, and MRP were all involved in a motor vehicle accident, and purportedly started treating with Fennelli on or around March 28, 2022. Roughly one month later, on April 27, 2022, Fennelli purportedly issued prescriptions to CA, DRP, and MRP that were provided to DRS for an LSO APL despite Fennelli not performing an examination or any other service for CA, DRP, or MRP on that date.

(iv)     On March 22, 2022, an Insured named VAR was involved in a motor vehicle accident, and purportedly started treating with Zakaria on or around March 29, 2022. Approximately five and a half months later, Zakaria purportedly issued a prescription for VAR that was provided to Aviso for an LSO despite Zakaria not performing an examination or other service on VAR on that date.

(v)      On May 1, 2022, an Insured named JG was involved in a motor vehicle accident, and purportedly started treating at with Sayeed on or around May 7, 2022. Roughly five weeks later, Sayeed purportedly issued prescription for JG that was provided to A&D for (i) a cervical traction unit, and (ii) a custom-fitted TLSO despite Sayeed not performing an examination or any other service on JG on that date.

(vi)     On June 19, 2022, an Insured named OM was involved in a motor vehicle accident, and purportedly started treating with Sayeed on or around June 21, 2022. Roughly two months later, Sayeed purportedly issued a prescription for OM that was provided to A&D for (i) LSO, (ii) replacement wheelchair seat cushion cover, (iii) mattress, (iv) over-bed table, (v) cervical collar, and (vi) positioning cushion despite not performing an examination or any other service on OM on that date.

(vii)    On October 26, 2022, an Insured named AS was involved in a motor vehicle accident, and purportedly started treating with Gordon Davis, D.O. ("Davis") on or around November 8, 2022. On December 19, 2022, Davis purportedly issued a prescription for AS that was provided to Aruna for an LSO despite Davis not performing an examination or other service on AS on that date.

(viii)   On October 28, 2022, an Insured named EC was involved in a motor vehicle accident, and purportedly started treating with Mohuchy on or around November 10, 2022. Roughly 19 days later, Mohuchy purportedly wrote a prescription for EC that was given to Alentus for (i) cervical traction device with pump, and (ii) LSO APL despite Mohuchy not performing an examination or any other service on EC on that date.

(ix)     On December 3, 2022, an Insured named JM was involved in a motor vehicle accident, and purportedly started treating with Peter Margulies, D.C. ("Margulies") on or around December 7, 2022. Roughly one month later, on January 9, 2023, Margulies purportedly issued two separate prescriptions for JM that were provided to Alentus for (i) a cervical traction unit, and (ii) LSO APL despite Margulies not performing an examination or any other service on JM on that date.

(x)    On January 25, 2023, an Insured named SMF was involved in a motor vehicle accident, and purportedly started treating with Igor Zilberman, M.D. ("Zilberman") on or around February 2, 2023. Approximately six days later, Zilberman purportedly issued prescription for SMF that was provided to Avamed for (i) cervical collar, (ii) cervical pillow, (iii) lumbar cushion, (iv) LSO, and (v) heating pad despite Zilberman not performing any examination or other service on SMF on that date.

187.    These are only representative samples.

188.    In keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants from the Referring Providers were medically unnecessary and issued pursuant to a predetermined fraudulent protocol, an overwhelming majority of the Insureds who treated Referring Providers received multiple prescriptions for virtually the same type of Fraudulent Equipment, similar to the examples above, despite the fact that they were involved in relatively minor and low-impact motor vehicle accidents.

189.    Further, and in keeping with the fact that the prescriptions for Fraudulent Equipment provided to the Defendants by Referring Providers were not medically necessary and provided pursuant to a predetermined fraudulent protocol, the Referring Providers who purportedly issued the prescriptions for Fraudulent Equipment virtually never had contemporaneously dated medical records, such as an examination report, that identified the Fraudulent Equipment listed on the prescriptions that the Defendants used to support the charges identified in Exhibits "1" through "7".

190.    Also, and in keeping with the fact that the prescriptions for Fraudulent Equipment were not medically necessary and issued pursuant to a predetermined fraudulent protocol, the contemporaneous medical records did not contain any sufficient information to explain why any of the prescribed Fraudulent Equipment was medically necessary, how it would help the Insureds,

or whether any of the Insureds should continue using any of the previously prescribed Fraudulent Equipment.

191.    For the reasons set forth above, and below, in each of the claims identified  in Exhibits "1" through "7", the Defendants falsely represented that Fraudulent Equipment were provided pursuant to prescriptions from healthcare providers for medically necessary DME or OD, and were therefore eligible to collect No-Fault Benefits in the first instance, when the prescriptions were for medically unnecessary Fraudulent Equipment issued pursuant to predetermined fraudulent protocols and provided to the Defendants pursuant agreements with others who are not presently identifiable.

**F.    The Improper Distribution of Fraudulent Equipment to Insureds by the Defendants Without Prescriptions Identifying Medically Necessary DME**

192.    The Supplier Defendants are not licensed medical professional corporations, and the Paper Owner Defendants are not licensed healthcare providers. As such, the Defendants were not lawfully permitted to prescribe or otherwise determine what DME or OD is medically necessary for the Insureds. For the same reason, the Defendants cannot properly dispense DME or OD to an Insured without a valid prescription from a licensed healthcare professional that definitively identifies medically necessary DME and/or OD to be provided.

193.    However, in many of the fraudulent claims identified in Exhibits "1" through "7", the Defendants improperly decided what DME and/or OD to provide to Insureds without a valid definitive prescription from a licensed healthcare provider to the extent that they actually provided any DME and/or OD to the Insureds.

194.    More specifically, the prescriptions for OD purportedly issued by the Referring Providers and provided to the Defendants did not definitively identify medically necessary DME and/or OD to be provided to the Insureds. For example, the prescriptions did not: (i) provide a

specific HCPCS Code for the DME and/or OD to be provided; or (ii) provide sufficient detail to direct the Defendants to a unique type of DME and/or OD.

195.    To the extent that some of the fraudulent claims identified in Exhibits "1" through "7" were based upon prescriptions that contained HCPCS Codes next to the descriptions of DME and/or OD, the prescriptions were still vague as the HCPCS Code identified on the prescription did not correspond with the description next to the code. Accordingly, the Defendants used vague and generic prescriptions to improperly decide what DME and OD to provide Insureds.

196.    While the Referring Providers issued vague and generic prescriptions, the Defendants did not obtain any additional documentation from the Referring Providers to approve or otherwise acknowledge the specific types of DME and/or OD that was medically necessary for the Insureds.

197.    In fact, the Defendants purposefully failed to seek supporting documentation to clarify the type of DME and/or OD to provide Insureds solely for their own financial gain.

198.    Even more, in many of the fraudulent claims identified in Exhibits "1" through "7", the Defendants improperly provided DME to Insureds as the Fraudulent Equipment purportedly provided was not identified on the prescriptions used to support the charges to GEICO.

199.    For example, the Defendants virtually always billed GEICO for provided Insureds identified in Exhibits "1" through "7" with "NMES units" when the prescriptions that the Defendants received identified a "TENS unit", which is a separate device that has an extremely different function and different reimbursement rate than an "NMES unit." An NMES unit is for muscle stimulation to promote muscle strength while a TENS unit is for nerve stimulation to assist with pain management.

200.    In a legitimate clinical setting, when a DME/OD Supplier would obtain a prescription that did not contain a HCPCS Code or a sufficient description to identify a specific item of DME and/or OD, the DME/OD Supplier would contact the referring healthcare provider to request clarification on the specific items that were being requested, including the features and requirements to dispense the appropriate DME and/or OD prescribed to each patient.

201.    As also part of a legitimate clinical setting, the DME/OD Supplier would have the referring healthcare provider sign documentation to confirm that the specific item of DME and/or OD – identified by HCPCS Code or a detailed description – was medically necessary for the patient.

202.    Upon information and belief, the Defendants never contacted Referring Providers to seek instruction and/or clarification, but rather made their own determination as to which specific item of Fraudulent Equipment to purportedly provide to each Insured. Not surprisingly, the Defendants elected to provide the Insureds with Fraudulent Equipment that had a reimbursement rate on the higher-end of the permissible range under the Fee Schedule.

203.    For example, based upon vague and generic prescriptions for a "lumbosacral support", "LSO back support," or "LSO", the Defendants improperly decided what type of OD to provide Insureds – to the extent any items were actually provided.

204.    It is impossible for any unlicensed healthcare professional to determine, based solely upon the vague and generic descriptions for a "lumbosacral support", "LSO back support," or "LSO" what item is medically necessary for a specific Insured given that these descriptions directly relate to the over 20 different unique HCPCS Codes, each with its own distinguishing features and maximum reimbursable amount, that can be dispensed to Insureds, including:

(i)     HCPCS Code L0625, a lumbar orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $43.27.

(ii)    HCPCS Code L0626, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $61.25.

(iii)   HCPCS Code L0627, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $322.98.

(iv)    HCPCS Code L0628, a lumbar-sacral orthosis device that is flexible, prefabricated, and off-the-shelf, which has a maximum reimbursement rate of $65.92.

(v)     HCPCS Code L0629, a lumbar-sacral orthosis device that is flexible and custom fabricated, which has a maximum reimbursement rate of $175.00.

(vi)    HCPCS Code L0630, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $127.26.

(vii)   HCPCS Code L0631, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $806.64.

(viii)  HCPCS Code L0632, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is custom fabricated, which has a maximum reimbursement rate of $1,150.00.

(ix)    HCPCS Code L0633, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $225.31.

(x)     HCPCS Code L0634, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $759.92.

(xi)    HCPCS Code L0635, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is prefabricated, which has a maximum reimbursement rate of $765.98.

(xii)   HCPCS Code L0636, a lumbar-sacral orthosis device with lumbar flexion and rigid posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xiii) HCPCS Code L0637, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xiv) HCPCS Code L0638, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is custom fabricated, which has a maximum reimbursement rate of $1,036.35.

(xv) HCPCS Code L0639, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated but customized to fit a specific patient, which has a maximum reimbursement rate of $844.13.

(xvi) HCPCS Code L0640, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is custom fabricated, which has a maximum reimbursement rate of $822.21.

(xvii) HCPCS Code L0641, a lumbar orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $53.80.

(xviii) HCPCS Code L0642, a lumbar orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $283.76.

(xix) HCPCS Code L0643, a lumbar-sacral orthosis device with rigid posterior panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $111.80.

(xx) HCPCS Code L0648, a lumbar-sacral orthosis device with rigid anterior and posterior panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $708.65.

(xxi) HCPCS Code L0649, a lumbar-sacral orthosis device with rigid posterior frame/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $197.95.

(xxii) HCPCS Code L0650, a lumbar-sacral orthosis device with rigid anterior and posterior frame/panels that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

(xxiii) HCPCS Code L0651, a lumbar-sacral orthosis device with rigid shell(s)/panel(s) that is prefabricated and off-the-shelf, which has a maximum reimbursement rate of $741.59.

205.   As unlicensed healthcare providers, the Defendants were not legally permitted to determine which of the above-available options were best suited for each Insured based upon a vague prescription for a "lumbosacral support", "LSO back support", or "LSO".

206.   However, the Defendants never contacted the Referring Providers to clarify which of the twenty-three (23) options was medically necessary for each Insured, and instead decided themselves which specific type of Fraudulent Equipment they would bill GEICO for.

207.   In fact, each and every time that the Defendants received a prescription from the Referring Providers for a "lumbosacral support", "LSO back support", or "LSO" the Defendants billed GEICO using HCPCS Code L0627 requesting a reimbursement of $322.98, and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

208.   Furthermore, each and every time that the Defendants received a prescription from the Referring Providers for a "LSO support custom fitted", the Defendants billed GEICO using HCPCS Code L0632, which is for a custom-fabricated device, requesting a reimbursement of $1,150.00 and thereby asserted that they provided the Insureds with that specific item, which resulted in needlessly inflated charges to GEICO.

209.   These are only representative examples. To the extent that the Defendants actually provided Fraudulent Equipment, they unlawfully prescribed the Fraudulent Equipment for virtually all of the claims identified in Exhibits "1" through "7" that are based upon vague and generic prescriptions because the Defendants decided which specific items of DME and/or OD to provide to the Insureds.

210.   The Fraudulent Equipment provided to the Insureds identified Exhibits "1" through "7" – to the extent that the Fraudulent Equipment was actually provided – by the Defendants was

not based on: (i) prescriptions by licensed healthcare providers containing sufficient detail to identify unique types DME and/or OD; or (ii) a determination by a licensed healthcare provider that the specific items dispensed to the Insureds were medically necessary. Rather, the Fraudulent Equipment was impermissibly based upon the decisions by the Defendants.

211.    In all of the claims identified in Exhibits "1" through "10" that were based upon vague and generic language contained in the prescriptions, the Defendants falsely represented that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions for reasonable and medically necessary DME and/or OD issued by healthcare providers with lawful authority to do so. To the contrary, the Fraudulent Equipment was purportedly provided by the Defendants based on their own determination of what unique types of Fraudulent Equipment to purportedly provide, and, thus, was not eligible for reimbursement of No-Fault Benefits.

### G.    The Defendants' Fraudulent Billing for DME and/or OD

212.    The bills submitted to GEICO and other New York automobile insurers by the Defendants were also fraudulent in that they misrepresented the DME and OD purportedly provided to the Insureds.

213.    In the bills and other documents submitted to GEICO, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were based upon some legitimate arms-length relationship, when the prescriptions for Fraudulent Equipment were based upon the unlawful financial arrangements between the Defendants and others who are not presently identifiable.

214.    In the bills and other documents submitted to GEICO, the Defendants misrepresented that the prescriptions relating to Fraudulent Equipment were for reasonable and medically necessary items when the prescriptions for Fraudulent Equipment were solely based –

not upon medical necessity but – predetermined fraudulent protocols due to unlawful financial arrangements between the Defendants and others who are presently unidentifiable.

215.    Further, the Defendants misrepresented in the bills submitted to GEICO that the Fraudulent Equipment purportedly provided to Insureds was based upon prescriptions issued by licensed healthcare providers authorized to issue such prescriptions, when in fact laypersons decided what Fraudulent Equipment to purportedly provide.

216.    Moreover, and as explained below, the bills submitted to GEICO by the Defendants contained the following misrepresentations: (i) the Fee Schedule items matched the HCPCS Codes identified in the bills to GEICO, when they did not; and (ii) the charges for Non-Fee Schedule items were permissible rates of reimbursement, when they were not.

### 1)    The Defendants' Fraudulently Misrepresented the Fee Schedule items Purportedly Provided

217.    When the Defendants' submitted bills to GEICO seeking payment for Fraudulent Equipment, each of the bills contained HCPCS codes that were used to describe the type of Fraudulent Equipment purportedly provided to the Insureds.

218.    All the bills to GEICO for Fraudulent Equipment were based upon HCPCS Codes that contain specific rates set forth in the Fee Schedule. Each HCPCS Code is specifically defined and contains unique requirements for the specific HCPCS Code.

219.    Additionally, Palmetto provides specific characteristics and requirements that DME and OD must meet in order to qualify for reimbursement under a specific HCPCS code for both Fee Schedule items and Non-Fee Schedule items.

220.    By submitting charges to GEICO under specific HCPCS Codes, the Defendants represented that Fraudulent Equipment they purportedly provided to Insureds appropriately corresponded to the HCPCS Codes contained in the bill.

221.    However, with the exception of codes relating to positioning pillows/cushions under HCPCS Code E0190, in virtually all of the bills submitted to GEICO for Fee Schedule items, the Defendants fraudulently represented to GEICO that the HCPCS Codes were accurate and appropriate for the Fee Schedule items purportedly provided to the Insureds – to the extent that any Fraudulent Equipment was actually provided.

222.    The prescriptions from the Referring Providers contained vague and generic terms for Fraudulent Equipment to be provided to the Insureds. Using those prescriptions, the Defendants' submitted bills to GEICO containing HCPCS codes that represented a more expensive tier of Fee Schedule items than necessary and that could be provided based upon the type of equipment identified in the vague and generic prescriptions.

223.    As indicated above, as part of the unlawful financial arrangements between the Defendants and others who are not presently identifiable, the Defendants were provided with prescriptions purportedly issued by the Referring Providers pursuant to predetermined fraudulent protocols, which provided the Defendants with the opportunity to increase the amount they could bill GEICO for Fraudulent Equipment purportedly provided to Insureds.

224.    Accordingly, the Defendants obtained vague and generic prescriptions for Fraudulent Equipment that permitted them to choose between multiple types of products that would fit the vague description contained on the prescription.

225.    Although several options were available to the Defendants based upon the vague and generic prescriptions, the Defendants virtually always billed GEICO – and likely other New York automobile insurers – using HCPCS Codes with higher reimbursement amounts than necessary, which was done so for their financial benefit.

226.    However, despite billing for Fee Schedule items using HCPCS Codes that had higher than necessary reimbursement amounts, to the extent that the Defendants provided any Fraudulent Equipment, the HCPCS codes in the bills submitted to GEICO severely misrepresented the type of Fee Schedule items purportedly provided to the Insureds.

227.    As identified in the claims contained within Exhibits "1" through "7", Defendants frequently submitted bills to GEICO for Fraudulent Equipment that was purportedly "custom-made" or "custom-fitted" for each Insured when – to the extent that the Fraudulent Equipment was actually provided to the Insureds – the Defendants never customized the Fraudulent Equipment as billed.

228.    For example, the Supplier Defendants used the vague and generic language in the prescriptions purportedly issued from the Referring Providers to bill GEICO for the following:  (i) a lumbar orthotic using HCPCS Code L0627 with a charge of $322.98 per unit; (ii) a lumbar sacral orthotic using HCPCS Code L0632 with a charge of $1,150.00 per unit; (iii) a shoulder orthotic using HCPCS Code L3674 with a charge of $896.92 per unit; (iv) a knee orthotic using HCPCS Code L1832 with a charge of $607.55; and (iv) a shoulder orthotic without joints using HCPCS Code L3671 with a charge of $690.23.

229.    However, the bills to GEICO for HCPCS Codes L0627, L0632, L3674, and L3671, fraudulently misrepresented the type of Fraudulent Equipment the Defendants purportedly provided to Insureds as the OD provided – to the extent that any OD was actually provided – were not reimbursable under the specific HCPCS Codes billed to GEICO.

230.    The products assigned to HCPCS Codes L0627, L0632, L3674, and L3671 are types of OD that are required to be custom-made or custom-fit for a specific patient by an individual with expertise.

231. However, despite billing GEICO – and other New York automobile insurers – using HCPCS Codes L0627, L0632, L3674, and L3671, the specific orthotic provided by the Defendants – to the extent that the Defendants provided the Insureds with any OD – did not contain the requirements set forth in HCPCS Codes L0627, L0632, L3674, and L3671 because – at a minimum – the items were never custom-made or custom-fit for each patient.

232. More specifically, the claims identified in Exhibits "1" through "7" for custom-fit and/or custom-made OD, including the claims for HCPCS Codes L0627, L0632, L3674, and L3671, fraudulently misrepresented that the Defendants satisfied all the requirements for the billed HCPCS Codes, because upon information and belief, the Defendants did not, and could not have, custom-made or custom-fit the OD as required.

233. To the extent that any of the charges identified in Exhibits "1" through "7" for custom-made or custom-fit OD, including the claims for HCPCS Codes L0627, L0632, L3674, and L3671 were provided, the Defendants did not customize the equipment as required by Palmetto.

234. To help clarify the term "custom fitted", Palmetto defined a custom fitted orthotic as something that "requires more than minimal self-adjustment at the time of delivery in order to provide an individualized fit, *i.e.*, the item must be trimmed, bent, molded (with or without heat), or otherwise modified resulting in alterations beyond minimal self-adjustment." See Palmetto, Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.

235. One of the key factors in identifying a "custom-fitted" orthotic is whether the item requires "minimal self-adjustment" or "substantial modification." Minimum self-adjustment, which is for off-the-shelf orthotic means that "the beneficiary, caretaker for the beneficiary, or

supplier of the device can perform and that does not require the services of a certified orthotist (that is, an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification) or an individual who has specialized training. For example, adjustment of straps and closures, bending or trimming for final fit or comfort (not all-inclusive) fall into this category." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

236.    By contrast, a substantial modification, which is required for a custom-fitted orthotic, is defined as "changes made to achieve an individualized fit of the item that requires the expertise of a certified orthotist or an individual who has equivalent specialized training in the provision of orthotics such as a physician, treating practitioner, an occupational therapist, or physical therapist in compliance with all applicable Federal and State licensure and regulatory requirements. A certified orthotist is defined as an individual who is certified by the American Board for Certification in Orthotics and Prosthetics, Inc., or by the Board for Orthotist/Prosthetist Certification." <u>See</u> Palmetto, <u>Correct Coding – Definitions Used for Off-the-Shelf versus Custom Fitted Prefabricated Orthotics (Braces) – Revised.</u>

237.    In the claims identified in Exhibits "1" through "7" for custom-made and custom-fit OD, including the claims for HCPCS Codes L0627, L0632, L3674, and L3671, the Defendants fraudulently misrepresented that the Defendants provided the Insureds with OD that was custom-made or custom-fit as defined by Palmetto, by a certified orthotist.

238.    Instead, to the extent that the Defendants provided any Fraudulent Equipment billed to GEICO as custom-made or custom-fit under HCPCS Codes L0627, L0632, L3674, and L3671, the Defendants dropped off Fraudulent Equipment without taking any action to customize the OD.

To the extent that the Defendants attempted to make any adjustments to the Insureds identified in Exhibits "1" through "7" that received purported customized OD, the Defendants only provided minimal self-adjustment, as defined by Palmetto, which only supports charges for off-the-shelf items.

239.    In keeping with the fact that the Defendants misrepresented that they custom-made or custom-fitted OD for the Insureds as billed to GEICO, none of the Paper Owner Defendants are certified orthotists and have not completed sufficient training to become certified orthotists.

240.    In addition to submitting hundreds of fraudulent charges for custom-made and custom-fit OD, the Defendants fraudulently misrepresented other Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided – and billed to GEICO in order to maximize profits.

241.    The claims identified in Exhibits "1" for HCPCS Code E2611 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

242.    Each of the claims identified within Exhibits "1" through "7" for HCPCS Code E2611 contained a charge for $282.40 based upon a prescription for a "lumbar cushion" or "lumber cushion". However, the product represented by HCPCS Code E2611 is defined as a general use wheelchair cushion with a width of less than 22 inches.

243.    Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E2611, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item in response to the prescriptions for a lumbar cushion or lumber cushion – were not cushions for use with a wheelchair.

244.    In keeping with the fact that the cushions provided to the Insureds were not for a wheelchair, virtually none of the Insureds identified in Exhibits "1" through "7", who were provided with a cushion by the Defendants that was billed to GEICO under HCPCS Code E2611, were in a wheelchair.

245.    To the extent that any items were actually provided to the Insureds for the charges identified in Exhibits "1" through "7" under HCPCS Code E2611, the items were positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190. HCPCS Code E0190 is defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories."

246.    Unlike the fraudulent charges for $282.40 for each lumbar cushion billed under HCPCS Code E2611 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $22.04 for each positioning cushion billed under HCPCS Code E0190.

247.    In each of the claims identified within Exhibits "1" through "7" where the Defendants billed for Fraudulent Equipment under HCPCS Code E2611, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment in response to a prescription for wheelchair cushion and that item satisfies the requirements of HCPCS Code E2611.

248.    The claims identified in Exhibits "1" through "7" for HCPCS Code E0272 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

249. Each of the claims identified within Exhibits "1" through "7" for HCPCS Code E0272 contained a charge for $155.52 based upon prescriptions for an "egg crate mattress". However, the product represented by HCPCS Code E0272 is defined as a foam rubber mattress, which is an actual mattress, not a mattress pad.

250. Despite billing GEICO – and other New York automobile insurers – using HCPCS Code E0272, the items provided by the Defendants – to the extent that the Defendants provided the Insureds with any item – were not foam or rubber mattresses as required by HCPCS Code E0272.

251. Upon information and belief, by contrast, to the extent that any items were provided, they were mattress pads/toppers in the shape of egg crates, not an actual mattress. Mattress pads are Fee Schedule items listed under HCPCS Code L0199, which is defined as a "Dry pressure pad for mattress, standard mattress length and width."

252. Unlike the fraudulent charges for $155.52 for each eggcrate mattress billed under HCPCS Code E0272 – and in keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $19.48 for each mattress pad/topper billed under HCPCS Code L0199.

253. In each of the claims identified within Exhibits "1" through "7" where the Defendants billed for Fraudulent Equipment under HCPCS Code E0272, each of the bills fraudulently misrepresented that the Defendants provided the Insureds with equipment that satisfies the requirements of HCPCS Code E0272.

254. The claims identified in Exhibits "1" through "7" for HCPCS Code E0272 is another example of how the Defendants fraudulently misrepresented the Fee Schedule items

purportedly provided to Insureds – to the extent that any Fraudulent Equipment was actually provided.

255.   With the exception of the claims identified using HCPCS Codes E0190 and electric heating pads under HCPCS Code E0215, in each of the claims for Fee Schedule items identified within Exhibits "1" through "7", to the extent that any Fraudulent Equipment was actually provided, the Defendants fraudulently misrepresented the HCPCS Codes identified in their billing to GEICO in order to increase the amount of No-Fault Benefits they could obtain, and where therefore not eligible to collect No-Fault Benefits in the first instance.

### 2)   The Defendants' Fraudulently Misrepresented the Rate of Reimbursement for Non-Fee Schedule Items

256.   When the Defendants' submitted bills to GEICO for Non-Fee Schedule items the Defendants requested reimbursement rates that were unique and purportedly based upon the specific Fraudulent Equipment purportedly provided to Insureds.

257.   As indicated above, under the No-Fault Laws, Non-Fee Schedule items are reimbursable as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

258.   By submitting bills to GEICO for Non-Fee Schedule items, the Defendants represented that they requested permissible reimbursement amounts that were calculated as the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the specific item.

259.   However, in virtually all of the charges to GEICO identified in Exhibit "1" for Non-Fee Schedule items, the Defendants fraudulently represented to GEICO that the reimbursement sought was the lesser of: (i) 150% of the legitimate acquisition cost; or (ii) the cost to the general public for the same item.

260.    Instead, the Defendants submitted bills to GEICO with charges that significantly inflated the permissible reimbursement amount of Non-Fee Schedule items in order to maximize the amount of No-Fault Benefits they were able to obtain from GEICO and other automobile insurers.

261.    The Defendants were able to perpetrate this scheme to fraudulently overcharge Non-Fee Schedule items by providing Insureds – to the extent that they actually provided any Fraudulent Equipment – with low-cost and low-quality Fraudulent Equipment.

262.    When the Defendants submitted bills to GEICO seeking No-Fault Benefits for Non-Fee Schedule items, the charges fraudulently represented 150% of the Defendants' acquisition cost of purportedly high-quality items. In actuality, the Defendants' legitimate acquisition cost for the low-quality items were significantly less.

263.    In an effort to further their scheme, upon information and belief, the Defendants, never researched the cost to the general public of the low-cost and low-quality Non-Fee Schedule items purportedly provided to the Defendants.

264.    Upon information and belief, the Defendants never researched the cost to the general public of the Non-Fee Schedule items that they purportedly provided because they knew that those items would be sold at significantly less than charges they submitted to GEICO, and other automobile insurers.

265.    In keeping with the fact that the Defendants fraudulently represented the permissible reimbursement amounts in the bills submitted to GEICO for the Non-Fee Schedule items solely for their financial benefit, the Defendants purposefully attempted to conceal their effort to overcharge GEICO for Non-Fee Schedule items by virtually never submitting a copy of their acquisition invoices in conjunction with their bills.

266.   Upon information and belief, the Defendants did not include invoices showing their legitimate cost to acquire the low-cost and low-quality Non-Fee Schedule items in the bills submitted to GEICO because the invoices would have shown that the permissible reimbursement amounts were significantly less than the charges contained in the bills.

267.   To the extent that the Defendants did submit invoices in conjunction with their bills to GEICO, upon information and belief, those invoices did not accurately represent the legitimate cost to acquire the Non-Fee Schedule items.

268.   As part of this scheme, the charges submitted to GEICO for Non-Fee Schedule items identified in Exhibits "1" through "7" virtually always misrepresented the permissible reimbursement amount.

269.   For example, the Defendants billed GEICO for hundreds of infrared heat lamps under HCPCS Code E0205 with charges between $180.00 and $190.00 per unit, falsely representing those fees as a permissible reimbursement amounts for the Non-Fee Schedule item.

270.   Upon information and belief, to the extent that any items were provided, the infrared lamps were low quality items, and the permissible reimbursement rate was significantly less than the $180.00 charged by the Defendants.

271.   In virtually all of the charges submitted to GEICO for infrared heat lamps, the Defendants fraudulently sought reimbursement for between $180.00 and $190.00 per unit when the maximum reimbursement charge was significantly less than $180.00.

272.   Similarly, the Defendants billed GEICO for massagers under HCPCS Code E1399 with charges between $180.00 and $187.50 per unit, falsely representing those fees as permissible reimbursement amounts for the Non-Fee Schedule item.

273.    Upon information and belief, to the extent that any items were provided, the massagers were low quality items, and the permissible reimbursement rate was significantly less than the $180.00 charged by the Defendants.

274.    In virtually all of the charges submitted to GEICO for massagers, the Defendants fraudulently sought reimbursement for $180.00 per unit when the maximum reimbursement charge was significantly less than $180.00.

275.    The Defendants also billed GEICO for hundreds of bed boards under HCPCS Code E0274 with a charge of $101.85 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

276.    Upon information and belief, to the extent that any items were provided, the bed boards were low quality cardboard items, and the permissible reimbursement rate was significantly less than the $101.85 charged by the Defendants.

277.    In virtually all of the charges submitted to GEICO for a bed board, the Defendants fraudulently sought reimbursement for $101.85 per unit when the maximum reimbursement charge was significantly less than $101.85.

278.    The Defendants also billed GEICO for hundreds of TENS units under HCPCS Code E0745 with a charge of $385.99 per unit that was falsely represented as a permissible reimbursement amount for the Non-Fee Schedule item.

279.    In keeping with the fact that the fraudulent charges were part of the Defendants' scheme to defraud GEICO and other automobile insurers – the Fee Schedule sets a maximum reimbursement rate of $76.25 for TENS unit, which would properly be billed under HCPCS Code E0730. Instead of using the proper code however, the Defendants chose to bill under HCPCS Code E0745 for prescriptions for "TENS Units" because HCPCS Code E0745 does not have a set

reimbursement rate and enables the Defendants charge GEICO more for the units allegedly provided.

280.    In virtually all of the charges submitted to GEICO for TENS units, the Defendants fraudulently sought reimbursement for $385.99 per unit when the maximum reimbursement charge was $76.25.

281.    The Defendants' also billed GEICO for orthopedic car seats under HCPCS Code E1399 with charges between $165.00 and $195.00 per unit, falsely representing those fees as permissible reimbursement amounts for the Non-Fee Schedule item.

282.    Upon information and belief, the orthopedic car seats purportedly provided to the Insureds – to the extent that any items were provided – qualified as positioning cushions, which are Fee Schedule items listed under HCPCS Code E0190, defined as a "Positioning cushion/pillow/wedge, any shape or size, includes all components and accessories", and having a maximum reimbursement rate of $22.04 per unit.

283.    In virtually all of the charges submitted to GEICO for orthopedic car seats, the Defendants fraudulently sought reimbursement for between $165.00 and $195.00 per unit when the maximum reimbursement charge was for $22.04.

284.    In each of the claims identified within Exhibits "1" through "7" for Non-Fee Schedule items, the Defendants fraudulently misrepresented in the bills submitted to GEICO that the charges were not in the Fee Schedule and were the lesser of 150% of the acquisition cost or the cost to the general public. Therefore, the Defendants were not eligible to collect No-Fault Benefits in the first instance.

**III.     The Fraudulent Billing the Defendants Submitted or Caused to be Submitted to GEICO**

285.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, HCFA-1500 forms, and/or treatment reports to GEICO through and in the names of the Supplier Defendants, seeking payment for Fraudulent Equipment.

286.    The NF-3 forms, HCFA-1500 forms and treatment reports that Defendants submitted or caused to be submitted to GEICO were false and misleading in the following material respects:

(i)    The NF-3 forms, HCFA-1500 forms, treatment reports, prescriptions, and delivery receipts uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, they were not properly licensed by the DCWP as they falsified the information contained in their application for a Dealer for Products License.

(ii)    The NF-3 forms, HCFA-1500 forms, and prescriptions uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment pursuant to prescriptions by licensed healthcare providers for reasonable and medically necessary DME and/or OD, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because, to the extent that the Defendants provided any of Fraudulent Equipment, it was based upon: (a) unlawful financial arrangements with others who are not presently identifiable; (b) predetermined fraudulent protocols without regard for the medical necessity of the items; and (c) decisions made by laypersons not based upon lawful prescriptions from licensed healthcare providers for medically necessary items.

(iii)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO that the Defendants provided Fraudulent Equipment that directly corresponded to the HCPCS Codes contained within each form, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – Fraudulent Equipment did not meet the specific requirements for the HCPCS Codes identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

(iv)    The NF-3 forms, HCFA-1500 forms, and treatment reports uniformly misrepresented to GEICO the reimbursement amount for the Non-Fee Schedule items provided to the Insureds, to the extent that the Defendants provided any Fraudulent Equipment, and therefore were eligible to receive No-Fault Benefits. In fact, the Defendants were not entitled to receive No-Fault Benefits because – to the extent that the Defendants provided any Fraudulent Equipment to the Insureds – falsified the permissible reimbursement amounts for Fraudulent Equipment identified in the NF-3 forms, HCFA-1500 forms, and treatment notes.

**IV.      The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance**

287.    The Defendants were legally and ethically obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

288.    To induce GEICO to promptly pay the fraudulent charges for Fraudulent Equipment, the Defendants systematically concealed their fraud and went to great lengths to accomplish this concealment.

289.    Specifically, they knowingly misrepresented that they were lawfully licensed by the City of New York as they never complied with regulations requiring the Supplier Defendants to obtain a Dealer in Products License from the DCWP because they falsely indicated, under penalty for false statements, in the application for a Dealer in Products License the common ownership by the Paper Owner Defendants for each of the DME Providers, and concealed these misrepresentation in order to submit bills to GEICO and prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

290.    The Defendants also knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were – not based upon medical necessity but – the result of unlawful financial arrangements, were provided to the Defendants, and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

291.    Additionally, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment provided to the Defendants were – not based upon medical necessity but – based upon predetermined fraudulent protocols and ultimately used as the basis to submit bills to GEICO in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

292.    Furthermore, the Defendants knowingly misrepresented and concealed that the prescriptions for Fraudulent Equipment were based upon decisions made by laypersons who did not have the legal authority to issue medically necessary DME/OD, and not by an actual healthcare provider's prescription for medically necessary DME/OD, in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

293.    Even more, the Defendants knowingly misrepresented and concealed that the HCPCS Codes for Fraudulent Equipment contained in the bills submitted by the Defendants to GEICO did not accurately reflect the type of Fraudulent Equipment provided to the Insureds in order to prevent GEICO from discovering that Fraudulent Equipment were billed to GEICO for financial gain.

294.    Lastly, the Defendants knowingly misrepresented the permissible reimbursement amount of the Non-Fee Schedule items contained in the bills submitted by the Defendants to GEICO and did not include any invoices to support the charges in order to prevent GEICO from discovering that Non-Fee Schedule items were billed to GEICO for financial gain.

295.    Once GEICO began to suspect that the Defendants were engaged in fraudulent billing and treatment activities, GEICO requested that they submit additional verification, including but not limited to, examinations under oath to determine whether the charges submitted through the Defendants were legitimate.

296.    The Defendants hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely filed expensive and time-consuming litigation and arbitration against GEICO and other insurers if the charges were not promptly paid in full.

297.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to, and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $630,000.00 based upon the fraudulent charges representing payments made by GEICO to the Supplier Defendants.

298.    Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

**FIRST CAUSE OF ACTION**
**Against the Supplier Defendants**
**(Aruna, A&D, Aviso, DRS, Alentus, Avamed, and Fastamed)**
**(Declaratory Judgment, 28 U.S.C. §§ 2201 and 2202)**

299.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

300.    There is an actual case in controversy between GEICO and the Supplier Defendants regarding more than $1.2 million in fraudulent billing that has been submitted to GEICO in the name of the Supplier Defendants.

301.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the Supplier Defendants did not comply with all local licensing laws as Fastamed never obtained a Dealer in Products license and the remaining Supplier Defendants

falsified the identifies of the corporate owners on the applications for Dealer in Products Licenses, and thus, were not properly lawfully licensed by the DCWP as required by regulations from the City of New York.

302.    The Supplier Defendants also have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO for Fraudulent Equipment were based – not upon medical necessity but – as a result of their participation in unlawful financial arrangements.

303.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills submitted to GEICO were based – not upon medical necessity but – pursuant to predetermined fraudulent protocols designed solely to financially enrich the Defendants and others who are not presently known, rather than to treat the Insureds.

304.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because the Supplier Defendants purportedly provided Fraudulent Equipment as a result of decisions made by laypersons, not based upon prescriptions issued by healthcare providers who are licensed to issue such prescriptions.

305.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the Supplier Defendants actually provided any Fraudulent Equipment – the Supplier Defendants fraudulently misrepresented the Fraudulent Equipment purportedly provided to Insureds as the HCPCS Codes identified in the bills did not accurately represent the Fee Schedule items provided to the Insureds.

306.    The Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO because – to the extent the Supplier Defendants provided any Fraudulent Equipment – the Supplier Defendants fraudulently misrepresented that the charges for Non-Fee

Schedule items contained within the bills to GEICO were less than or equal to the maximum permissible reimbursement amount.

307. Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO under the names of Aruna, A&D, Aviso, DRS, Alentus, Avamed, and Fastamed.

## SECOND CAUSE OF ACTION
### Against the Paper Owner Defendants and the John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

308. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

309. Aruna, A&D, Aviso, DRS, Alentus, Avamed, and Fastamed together constitute an association-in-fact "enterprise" (the "Supplier Defendant Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

310. The members of the Supplier Defendant Enterprise are and have been associated through time, joined in purpose, and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Aruna, A&D, Aviso, DRS, Alentus, Avamed, and Fastamed are ostensibly independent businesses – with different names and tax identification numbers – that were used as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO.

311. The Supplier Defendant Enterprise operated under seven names and tax identification numbers in order to limit the time period and volume of bills submitted under any individual tax identification number, in an attempt to avoid attracting the attention and scrutiny of GEICO and

other insurers to the volume of billing and the pattern of fraudulent charges originating from any one business. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the Supplier Defendant Enterprise acting singly or without the aid of each other.

312.    The Supplier Defendant Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing, overseeing, and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts and/or illegal verbal agreements, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

313.    The Paper Owner Defendants and the John Doe Defendant "1" have each been employed by and/or associated with the Supplier Defendant Enterprise.

314.    The Paper Owner Defendants and the John Doe Defendant "1" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the Supplier Defendant Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the Supplier Defendant Enterprise was not eligible to receive under the No-Fault Laws because: (i) in every claim, the Supplier Defendants were not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in

Products license or never obtained a Dealer in Products license; (ii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibits "1" through "7".

315.    The Supplier Defendant Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in the Paper Owner Defendants and John Doe Defendant "1" operated the Supplier Defendant Enterprise, insofar as the Supplier Defendants never operated as a legitimate DME/OD provider, never were eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the Supplier Defendants to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a

threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the Supplier Defendants to the present day.

316. The Supplier Defendant Enterprise is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the Supplier Defendant Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

317. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $630,000.00 pursuant to the fraudulent bills submitted through the Supplier Defendant Enterprise.

318. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**THIRD CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

319. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 318 of this Complaint as if fully set forth at length herein.

320. The Supplier Defendant Enterprise is an association-in-fact "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

321. The Paper Owner Defendants and the John Doe Defendants are employed by and/or associated with the Supplier Defendant Enterprise.

322. The Paper Owner Defendants and the John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Supplier Defendant Enterprise's affairs through a pattern of racketeering activity consisting

of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the Supplier Defendant Enterprise was not eligible to receive under the No-Fault Laws because: (i) in every claim, the Supplier Defendants were not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, the Supplier Defendants submitted bills to GEICO for DME/OD they purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that the Supplier Defendants actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the charts annexed hereto as Exhibits "1" through "7".

323.     The Paper Owner Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

324.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $630,000.00 pursuant to the fraudulent bills submitted by Defendants through the Supplier Defendants.

325.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FOURTH CAUSE OF ACTION**
**Against Mavashev and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

326.     GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

327.     Aruna is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

328.     Mavashev and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Aruna's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Aruna was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, the Aruna was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, Aruna submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained

through unlawful financial arrangements; (iii) in every claim, Aruna submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Aruna actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Aruna actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

329.    Aruna's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Mavashev and John Doe Defendant "1" operate Aruna, insofar as Aruna is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Aruna to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Mavashev and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Aruna to the present day.

330.    Aruna is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These

inherently unlawful acts are taken by Aruna in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

331.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $105,000.00 pursuant to the fraudulent bills submitted through Aruna.

332.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**FIFTH CAUSE OF ACTION**
**Against Aruna, Mavashev, and John Doe Defendant "1"**
**(Common Law Fraud)**

333.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

334.    Aruna, Mavashev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

335.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Aruna had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Aruna was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the

scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

336.    Aruna, Mavashev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Aruna that were not compensable under the No-Fault Laws.

337.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $105,000.00 pursuant to the fraudulent bills submitted by Aruna, Mavashev, and John Doe Defendant "1".

338.    Aruna, Mavashev, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

339.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Aruna, Mavashev, and John Doe Defendant "1"
### (Unjust Enrichment)

340.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

341.     As set forth above, Aruna, Mavashev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

342.     When GEICO paid the bills and charges submitted by or on behalf of Aruna for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Aruna, Mavashev, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

343.     Aruna, Mavashev, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Aruna, Mavashev, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

344.     The retention of GEICO's payments by Aruna, Mavashev, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

345.     By reason of the above, Aruna, Mavashev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $105,000.00.

## SEVENTH CAUSE OF ACTION
### Against Bakhramov, Mavashev and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

346.     GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

347.     A&D is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

348.     Bakhramov, Mavashev and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of A&D's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that A&D was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, A&D was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, A&D submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, A&D submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that A&D actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that A&D actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A

representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "2".

349.     A&D's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bakhramov, Mavashev and John Doe Defendant "1" operate A&D, insofar as A&D is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for A&D to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Bakhramov, Mavashev and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by A&D to the present day.

350.     A&D is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by A&D in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

351.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted through A&D.

352.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against A&D, Bakhramov, Mavashev and John Doe Defendant "1"
### (Common Law Fraud)

353.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

354.    A&D, Bakhramov, Mavashev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

355.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that A&D had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact A&D was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii)  the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation

that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

356.    A&D, Bakhramov, Mavashev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through A&D that were not compensable under the No-Fault Laws.

357.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $94,000.00 pursuant to the fraudulent bills submitted by A&D, Bakhramov, Mavashev, and John Doe Defendant "1".

358.    A&D, Bakhramov, Mavashev, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

359.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against A&D, Bakhramov, Mavashev, and John Doe Defendant "1"
### (Unjust Enrichment)

360.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

361.    As set forth above, A&D, Bakhramov, Mavashev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

362.     When GEICO paid the bills and charges submitted by or on behalf of A&D for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the A&D, Bakhramov, Mavashev, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

363.     A&D, Bakhramov, Mavashev, and John Doe Defendants "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the A&D, Bakhramov, Mavashev, and John Doe Defendants "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

364.     A&D, Bakhramov, Mavashev, and John Doe Defendants "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

365.     By reason of the above, A&D, Bakhramov, Mavashev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $94,000.00.

**TENTH CAUSE OF ACTION**
**Against the Paper Owner Defendants and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

366.     GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

367.     Aviso is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

368.     The Paper Owner Defendants and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Aviso's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of

fraudulent charges on a continuous basis since inception seeking payments that Aviso was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Aviso was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, Aviso submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Aviso submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Aviso actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Aviso actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "3".

369.    Aviso's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which the Paper Owner Defendants and John Doe Defendant "1" operate Aviso, insofar as Aviso is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Aviso to function. Furthermore, the intricate planning required to carry

out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Paper Owner Defendants and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Aviso to the present day.

370.    Aviso is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Aviso in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

371.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $77,000.00 pursuant to the fraudulent bills submitted through Aviso.

372.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**ELEVENTH CAUSE OF ACTION**
**Against Aviso, the Paper Owner Defendants, and John Doe Defendants "1"**
**(Common Law Fraud)**

373.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

374.    Aviso, the Paper Owner Defendants, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

375.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Aviso had a lawful Dealer in Products License and

was entitled to No-Fault Benefits when in fact Aviso was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

376.    Aviso, the Paper Owner Defendants, and John Doe Defendants "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Aviso that were not compensable under the No-Fault Laws.

377.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by

reason of the above-described conduct in that it has paid at least $77,000.00 pursuant to the fraudulent bills submitted by Aviso, Paper Owner Defendants, and John Doe Defendant "1".

378.    Aviso, the Paper Owner Defendants, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

379.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
### Against Aviso, the Paper Owner Defendants, and John Doe Defendant "1"
### (Unjust Enrichment)

380.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

381.    As set forth above, Aviso, the Paper Owner Defendants, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

382.    When GEICO paid the bills and charges submitted by or on behalf of Aviso for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Aviso, the Paper Owner Defendants, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

383.    Aviso, the Paper Owner Defendants, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Aviso, the Paper Owner Defendants, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

384.    Aviso, the Paper Owner Defendants, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

385.    By reason of the above, Aviso, the Paper Owner Defendants, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $77,000.00.

**THIRTEENTH CAUSE OF ACTION**
**Against Bakhramov, Mavashev and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

386.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

387.    DRS is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

388.    Bakhramov, Mavashev and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of DRS's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that DRS was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, DRS was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license; (ii) in every claim, DRS submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, DRS submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that DRS

actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that DRS actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "4".

389.    DRS's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Bakhramov, Mavashev and John Doe Defendant "1" operate DRS, insofar as DRS is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for DRS to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that Bakhramov, Mavashev and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by DRS to the present day.

390.    DRS is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by DRS in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

391.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted through DRS.

392.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
### Against DRS, Bakhramov, Mavashev, and John Doe Defendant "1"
### (Common Law Fraud)

393.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

394.    DRS, Bakhramov, Mavashev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

395.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that DRS had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact DRS was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii)  the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to

predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

396.    DRS, Bakhramov, Mavashev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through DRS that were not compensable under the No-Fault Laws.

397.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $180,000.00 pursuant to the fraudulent bills submitted by DRS, Bakhramov, Mavashev, and John Doe Defendant "1".

398.    DRS, Bakhramov, Mavashev, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

399.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTEENTH CAUSE OF ACTION
### Against DRS, Bakhramov, Mavashev, and John Doe Defendant "1"
### (Unjust Enrichment)

400.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

401.    As set forth above, DRS, Bakhramov, Mavashev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

402.    When GEICO paid the bills and charges submitted by or on behalf of DRS for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on DRS, Bakhramov, Mavashev, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

403.    DRS, Bakhramov, Mavashev, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that DRS, Bakhramov, Mavashev, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

404.    DRS, Bakhramov, Mavashev, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

405.    By reason of the above, DRS, Bakhramov, Mavashev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $180,000.00.

## SIXTEENTH CAUSE OF ACTION
### Against Sorokin and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

406.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

407. Alentus is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

408. Sorokin and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Alentus's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Alentus was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Alentus was not properly licensed as required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, Alentus submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Alentus submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Alentus actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Alentus actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted

to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "5".

409.    Alentus's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Sorokin and John Doe Defendant "1" operate Alentus, insofar as Alentus is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Alentus to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Sorokin and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Aruna to the present day.

410.    Alentus is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Alentus in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

411.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $42,000.00 pursuant to the fraudulent bills submitted through Aruna.

412.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### SEVENTEENTH CAUSE OF ACTION
**Against Alentus, Sorokin, and John Doe Defendant "1"**
**(Common Law Fraud)**

413.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

414.    Alentus, Sorokin, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

415.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Alentus had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Alentus was not lawfully licensed as they knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii)  the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation

that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

416.    Alentus, Sorokin, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Alentus that were not compensable under the No-Fault Laws.

417.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $42,000.00 pursuant to the fraudulent bills submitted by Alentus, Sorokin, and John Doe Defendant "1".

418.    Alentus, Sorokin, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

419.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTEENTH CAUSE OF ACTION
### Against Alentus, Sorokin, and John Doe Defendant "1"
### (Unjust Enrichment)

420.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

421.    As set forth above, Alentus, Sorokin, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

422.     When GEICO paid the bills and charges submitted by or on behalf of Alentus for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Alentus, Sorokin, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

423.     Alentus, Sorokin, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Alentus, Sorokin, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

424.     Alentus, Sorokin, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

425.     By reason of the above, Alentus, Sorokin, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $42,000.00.

**NINETEENTH CAUSE OF ACTION**
**Against Sorokin and John Doe Defendant "1"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

426.     GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

427.     Avamed is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

428.     Sorokin and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Avamed's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Avamed was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Avamed was not properly licensed as

104

required by regulations from the City of New York because they knowingly falsified information on their applications for a Dealer in Products license or never obtained a Dealer in Products license; (ii) in every claim, Avamed submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Avamed submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Avamed actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Avamed actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "6".

429.    Avamed's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Sorokin and John Doe Defendant "1" operate Avamed, insofar as Avamed is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Avamed to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that

the Sorokin and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Aruna to the present day.

430.     Avamed is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Avamed in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

431.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $55,000.00 pursuant to the fraudulent bills submitted through Aruna.

432.     By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**TWENTIETH CAUSE OF ACTION**
**Against Avamed, Sorokin, and John Doe Defendant "1"**
**(Common Law Fraud)**

433.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

434.     Avamed, Sorokin, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent bills seeking payment for Fraudulent Equipment.

435.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Avamed had a lawful Dealer in Products License and was entitled to No-Fault Benefits when in fact Avamed was not lawfully licensed as they

knowingly falsified the business owner information on their application for a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii) the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

436.    Avamed, Sorokin, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Avamed that were not compensable under the No-Fault Laws.

437.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $55,000.00 pursuant to the fraudulent bills submitted by Avamed, Sorokin, and John Doe Defendant "1".

438.    Avamed, Sorokin, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

439.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FIRST CAUSE OF ACTION
**Against Avamed, Sorokin, and John Doe Defendant "1"**
**(Unjust Enrichment)**

440.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

441.    As set forth above, Avamed, Sorokin, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

442.    When GEICO paid the bills and charges submitted by or on behalf of Avamed for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Avamed, Sorokin, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

443.    Avamed, Sorokin, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Avamed, Sorokin, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

444.    Avamed, Sorokin, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

445.    By reason of the above, Avamed, Sorokin, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $55,000.00.

## TWENTY-SECOND CAUSE OF ACTION
### Against Mavashev and John Doe Defendant "1"
### (Violation of RICO, 18 U.S.C. § 1962(c))

446.    GEICO incorporates, as though fully set forth herein, each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

447.    Fastamed is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affected interstate commerce.

448.    Mavashev and John Doe Defendant "1" knowingly conducted and/or participated, directly or indirectly, in the conduct of Fastamed's affairs through a pattern of racketeering activity consisting of repeated violations of the mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis since inception seeking payments that Fastamed was not eligible to receive under the New York No-Fault Laws because: (i) in every claim, Fastamed was not properly licensed as required by regulations from the City of New York because they never obtained a Dealer in Products license; (ii) in every claim, Fastamed submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions obtained through unlawful financial arrangements; (iii) in every claim, Fastamed submitted bills to GEICO for DME/OD it purportedly provided to Insureds based upon prescriptions issued pursuant to predetermined fraudulent protocols – not upon medical necessity; (iv) in many claims, to the extent that Fastamed actually provided DME/OD to Insureds, the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) in many claims, to the extent that Fastamed actually provided DME/OD to Insureds, the Fraudulent Equipment misrepresented the DME/OD provided because the equipment did not meet the requirements for the specific HCPCS Codes billed to GEICO; and (vi) in many claims, to the extent that any Fraudulent

Equipment was actually provided, the Fraudulent Equipment misrepresented the permissible reimbursement rate for the DME/OD provided. A representative sample of the fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "7".

449.    Fastamed's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers.  The predicate acts of mail fraud are the regular way in which Mavashev and John Doe Defendant "1" operate Fastamed, insofar as Fastamed is not engaged as a legitimate supplier of DME, and therefore, acts of mail fraud are essential in order for Fastamed to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a continued threat of criminal activity, as does the fact that the Mavashev and John Doe Defendant "1" continue to submit and attempt collection on the fraudulent billing submitted by Fastamed to the present day.

450.    Fastamed is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers.  These inherently unlawful acts are taken by Fastamed in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

451.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted through Fastamed.

452.    By reason of its injury, GEICO is entitled to treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-THIRD CAUSE OF ACTION
### Against Fastamed, Mavashev, and John Doe Defendant "1"
### (Common Law Fraud)

453.     GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

454.     Fastamed, Mavashev, and John Doe Defendant "1" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for Fraudulent Equipment.

455.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Fastamed complied with all local licensing requirements and was entitled to No-Fault Benefits when in fact Fastamed was not lawfully licensed as they never obtained a Dealer in Products license; (ii) the representation that that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided as a result of unlawful financial arrangements, which were used to financial enrich those that participated in the scheme; (iii)  the representation that the prescriptions for Fraudulent Equipment were for reasonable and medically necessary DME and/or OD when in fact the prescriptions were provided pursuant to predetermined fraudulent protocols and not based upon medical necessity; (iv) the representation that the Fraudulent Equipment was issued based upon proper prescriptions by licensed healthcare providers when the Fraudulent Equipment were provided pursuant to decisions from laypersons who are not legally authorized to prescribe DME and/or OD; (v) the representation that the Fraudulent Equipment accurately reflected the HCPCS Codes contained in the bills submitted to GEICO when the Fraudulent Equipment did not represent the DME/OD provided because the equipment did not meet the requirements for the

specific HCPCS Codes billed to GEICO; and (vi) the representation that the charges for Fraudulent Equipment were permissible when the charges exceeded the permissible reimbursement permitted under the No-Fault Laws.

456.    Fastamed, Mavashev, and John Doe Defendant "1" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Fastamed that were not compensable under the No-Fault Laws.

457.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least $72,000.00 pursuant to the fraudulent bills submitted by Fastamed, Mavashev, and John Doe Defendant "1".

458.    Fastamed, Mavashev, and John Doe Defendant "1"'s extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

459.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-FOURTH CAUSE OF ACTION
**Against Fastamed, Mavashev, and John Doe Defendant "1"**
**(Unjust Enrichment)**

460.    GEICO repeats and realleges each and every allegation contained in paragraphs 1 through 298 of this Complaint as if fully set forth at length herein.

461.    As set forth above, Fastamed, Mavashev, and John Doe Defendant "1" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

462.     When GEICO paid the bills and charges submitted by or on behalf of Fastamed for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on Fastamed, Mavashev, and John Doe Defendant "1"'s improper, unlawful, and/or unjust acts.

463.     Fastamed, Mavashev, and John Doe Defendant "1" have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Fastamed, Mavashev, and John Doe Defendant "1" voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

464.     Fastamed, Mavashev, and John Doe Defendant "1"'s retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

465.     By reason of the above, Fastamed, Mavashev, and John Doe Defendant "1" have been unjustly enriched in an amount to be determined at trial, but in no event less than $72,000.00.

## JURY DEMAND

466.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor:

A.     On the First Cause of Action against the Supplier Defendants (Aruna, A&D, Aviso, DRS, Alentus, Avamed, and Fastamed), a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, the Supplier Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of action against the Paper Owner Defendants and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $630,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.     On the Third Cause of Action against the Paper Owner Defendants and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $630,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.     On the Fourth Cause of Action against Mavashev and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $105,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.     On the Fifth Cause of Action against Aruna, Mavashev, and John Doe Defendant "1" compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $105,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

F.     On the Sixth Cause of Action against Aruna, Mavashev, and John Doe Defendant "1", more than $105,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

G.     On the Seventh Cause of Action against Bakhramov, Mavashev, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $94,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.     On the Eighth Cause of Action against A&D, Bakhramov, Mavashev, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $94,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  I.  On the Ninth Cause of Action against A&D, Bakhramov, Mavashev, and John Doe Defendant "1", more than $94,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  J.  On the Tenth Cause of Action against Paper Owner Defendants and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $77,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  K.  On the Eleventh Cause of Action against Aviso, the Paper Owner Defendants, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $77,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

  L.  On the Twelfth Cause of Action against Aviso, the Paper Owner Defendants, and John Doe Defendant "1", more than $77,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

  M.  On the Thirteenth Cause of Action against Bakhramov, Mavashev, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $180,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

  N.  On the Fourteenth Cause of Action against DRS, Bakhramov, Mavashev, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at

trial but in excess of $180,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

O.      On the Fifteenth Cause of Action against DRS, Bakhramov, Mavashev, and John Doe Defendant "1", more than $180,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

P.      On the Sixteenth Cause of Action against Sorokin and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $42,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Q.      On the Seventeenth Cause of Action against Alentus, Sorokin, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $42,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

R.      On the Eighteenth Cause of Action against Alentus, Sorokin, and John Doe Defendant "1", more than $42,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

S.      On the Nineteenth Cause of Action against Sorokin and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $55,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

T.      On the Twentieth Cause of Action against Avamed, Sorokin, and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial

but in excess of $55,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

U.    On the Twenty-First Cause of Action against Avamed, Sorokin, and John Doe Defendant "1", more than $55,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

V.    On the Twenty-Second Cause of Action against Mavashev and John Doe Defendant "1", compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $72,000.00 together with treble damages, costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

W.    On the Twenty-Third Cause of Action against Fastamed, Mavashev, and John Doe Defendant "1" compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $72,000.00 together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

X.    On the Twenty-Fourth Cause of Action against Fastamed, Mavashev, and John Doe Defendant "1", more than $72,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:  March 13, 2024
        Uniondale, New York

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_____

Barry I. Levy, Esq.
Michael A. Sirignano, Esq.
Michael Vanunu, Esq.
Alexandra Wolff, Esq.
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees
Insurance Company, GEICO Indemnity Company,
GEICO General Insurance Company and GEICO
Casualty Company*

4888-7408-5766, v. 4